# MURPHY *v.* FLORIDA

No. 74-5116. Argued April 15, 1975—Decided June 16, 1975

MARSHALL, J., delivered the opinion of the Court, in which DOUGLAS, STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BURGER, C. J., filed an opinion concurring in the judgment, *post*, p. 803. BRENNAN, J., filed a dissenting opinion, *post*, p. 804.

*Harvey S. Swickle* argued the cause and filed a brief for petitioner.

*William L. Rogers*, Assistant Attorney General of Florida, argued the cause for respondent *pro hac vice*. With him on the brief was *Robert L. Shevin*, Attorney General.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The question presented by this case is whether the petitioner was denied a fair trial because members of the jury had learned from news accounts about a prior felony conviction or certain facts about the crime with which he was charged. Under the circumstances of this case, we find that petitioner has not been denied due process, and we therefore affirm the judgment below.

## I

Petitioner was convicted in the Dade County, Fla., Criminal Court in 1970 of breaking and entering a home, while armed, with intent to commit robbery, and of assault with intent to commit robbery. The charges stemmed from the January 1968 robbery of a Miami Beach home and petitioner's apprehension, with three others, while fleeing from the scene.

The robbery and petitioner's arrest received extensive press coverage because petitioner had been much in the news before. He had first made himself notorious for his part in the 1964 theft of the Star of India sapphire from a museum in New York. His flamboyant lifestyle made him a continuing subject of press interest; he was generally referred to—at least in the media—as "Murph the Surf."

Before the date set for petitioner's trial on the instant charges, he was indicted on two counts of murder in

Broward County, Fla. Thereafter the Dade County court declared petitioner mentally incompetent to stand trial; he was committed to a hospital and the prosecutor *nolle prossed* the robbery indictment. In August 1968 he was indicted by a federal grand jury for conspiring to transport stolen securities in interstate commerce. After petitioner was adjudged competent for trial, he was convicted on one count of murder in Broward County (March 1969) and pleaded guilty to one count of the federal indictment involving stolen securities (December 1969). The indictment for robbery was refiled in August 1969 and came to trial one year later.

The events of 1968 and 1969 drew extensive press coverage. Each new case against petitioner was considered newsworthy, not only in Dade County but elsewhere as well.[1] The record in this case contains scores of articles reporting on petitioner's trials and tribulations during this period; many purportedly relate statements that petitioner or his attorney made to reporters.

Jury selection in the present case began in August 1970. Seventy-eight jurors were questioned. Of these, 30 were excused for miscellaneous personal reasons; 20 were excused peremptorily by the defense or prosecution; 20 were excused by the court as having prejudged petitioner; and the remaining eight served as the jury and two alternates. Petitioner's motions to dismiss the chosen jurors, on the ground that they were aware that he had previously been convicted of either the 1964 Star of India theft or the Broward County murder, were denied, as was his renewed motion for a change of venue based on allegedly prejudicial pretrial publicity.

---

[1] See, *e. g.*, New York Times, May 9, 1968, p. 51 (surrender on murder indictment); July 3, 1968, p. 70 (held incompetent to stand trial); Aug. 15, 1968, p. 44 (indicted in securities case); Feb. 18, 1969, p. 31 (murder trial scheduled); Mar. 2, 1969, p. 63 (convicted of murder).

At trial, petitioner did not testify or put in any evidence; assertedly in protest of the selected jury, he did not cross-examine any of the State's witnesses. He was convicted on both counts, and after an unsuccessful appeal he sought habeas corpus relief in the District Court for the Southern District of Florida.

The District Court denied petitioner relief, 363 F. Supp. 1224 (1973), and the Court of Appeals for the Fifth Circuit affirmed. 495 F. 2d 553 (1974). We granted certiorari, 419 U. S. 1088 (1974), in order to resolve the apparent conflict between the decision below and that of the Third Circuit in *United States ex rel. Doggett* v. *Yeager,* 472 F. 2d 229 (1973), over the applicability of *Marshall* v. *United States,* 360 U. S. 310 (1959), to state criminal proceedings.

## II

The defendant in *Marshall* was convicted of dispensing certain drugs without a prescription. In the course of the trial seven of the jurors were exposed to various news accounts relating that Marshall had previously been convicted of forgery, that he and his wife had been arrested for other narcotics offenses, and that he had for some time practiced medicine without a license. After interviewing the jurors, however, the trial judge denied a motion for a mistrial, relying on the jurors' assurances that they could maintain impartiality in spite of the news articles.

Noting that the jurors had been exposed to information with a high potential for prejudice, this Court reversed the conviction. It did so, however, expressly "[i]n the exercise of [its] supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts," and not as a matter of constitutional compulsion. *Id.,* at 313.

In the face of so clear a statement, it cannot be maintained that *Marshall* was a constitutional ruling now applicable, through the Fourteenth Amendment, to the States. Petitioner argues, nonetheless, that more recent decisions of this Court have applied to state cases the principle underlying the *Marshall* decision:[2] that persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced. We cannot agree that *Marshall* has any application beyond the federal courts.

Petitioner relies principally upon *Irvin* v. *Dowd,* 366 U. S. 717 (1961), *Rideau* v. *Louisiana,* 373 U. S. 723 (1963), *Estes* v. *Texas,* 381 U. S. 532 (1965), and *Sheppard* v. *Maxwell,* 384 U. S. 333 (1966). In each of these cases, this Court overturned a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage.

In *Irvin* v. *Dowd* the rural community in which the trial was held had been subjected to a barrage of inflammatory publicity immediately prior to trial, including information on the defendant's prior convictions, his confession to 24 burglaries and six murders including the one for which he was tried, and his unaccepted offer to plead guilty in order to avoid the death sentence. As a result, eight of the 12 jurors had formed an opinion that the defendant was guilty before the trial began; some went "so far as to say that it would take evidence to overcome their belief" in his guilt. 366 U. S., at 728. In these circumstances, the Court readily found actual prejudice against the petitioner to a degree that rendered a fair trial impossible.

Prejudice was presumed in the circumstances under which the trials in *Rideau, Estes,* and *Sheppard* were

---

[2] This was the theory adopted by the Third Circuit in *United States ex rel. Doggett* v. *Yeager,* 472 F. 2d 229 (1973).

held. In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings. In *Rideau* the defendant had "confessed" under police interrogation to the murder of which he stood convicted. A 20-minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the *voir dire* for evidence of actual prejudice because it considered the trial under review "but a hollow formality"— the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.

The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process. To resolve this case, we must turn, therefore, to any indications in the totality of circumstances that petitioner's trial was not fundamentally fair.

### III

The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." *Irvin* v. *Dowd*, 366 U. S., at 722. Qualified

jurors need not, however, be totally ignorant of the facts and issues involved.

> "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*, at 723.

At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Ibid.*

The *voir dire* in this case indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside. Some of the jurors had a vague recollection of the robbery with which petitioner was charged and each had some knowledge of petitioner's past crimes,[3] but none betrayed any belief in the relevance of petitioner's past to the present case.[4] Indeed, four of the six jurors volunteered their

---

[3] One juror who did not know that petitioner had been previously convicted for the theft of the Star of India sapphire, one who did not know of the murder conviction, and one who had never heard about the securities case were informed about them by petitioner's counsel, who then asked whether that knowledge would not prejudice them against petitioner. We will not readily discount the assurances of a juror insofar as his exposure to a defendant's past crimes comes from the defendant or counsel. We note also, and disapprove, counsel's habitual references to his client, at *voir dire*, as "Murph the Surf" rather than by his name.

[4] We must distinguish between mere familiarity with petitioner or his past and an actual predisposition against him, just as we have

views of its irrelevance, and one suggested that people who have been in trouble before are too often singled out for suspicion of each new crime—a predisposition that could only operate in petitioner's favor.

In the entire *voir dire* transcript furnished to us, there is only one colloquy on which petitioner can base even a colorable claim of partiality by a juror. In response to a leading and hypothetical question, presupposing a two- or three-week presentation of evidence against petitioner and his failure to put on any defense, one juror conceded that his prior impression of petitioner would dispose him to convict.[5] We cannot attach great sig-

---

in the past distinguished largely factual publicity from that which is invidious or inflammatory. *E. g., Beck* v. *Washington,* 369 U. S. 541, 556 (1962). To ignore these real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community, whether they be notorious or merely prominent.

[5] The entire exchange appears at App. 139:

"Q. Now, when you go into that jury room and you decide upon Murphy's guilt or innocence, you are going to take into account that fact that he is a convicted murderer; aren't you?

"A. Not if we are listening to the case, I wouldn't.

"Q. But you know about it?

"A. How can you not know about it?

"Q. Fine, thank you.

"When you go into the jury room, the fact that he is a convicted murderer, that is going to influence your verdict; is it not?

"A. We are not trying him for murder.

"Q. The fact that he is a convicted murderer and jewel thief, that would influence your verdict?

"A. I didn't know he was a convicted jewel thief.

"Q. Oh, I see.

"I am sorry I put words in your mouth.

"Now, sir, after two or three weeks of being locked up in a downtown hotel, as the Court determines, and after hearing the State's case, and after hearing no case on behalf of Murphy, and hearing no testimony from Murphy saying, 'I am innocent, Mr. [juror's

nificance to this statement, however, in light of the leading nature of counsel's questions and the juror's other testimony indicating that he had no deep impression of petitioner at all.

The juror testified that he did not keep up with current events and, in fact, had never heard of petitioner until he arrived in the room for prospective jurors where some veniremen were discussing him. He did not know that petitioner was "a convicted jewel thief" even then; it was petitioner's counsel who informed him of this fact. And he volunteered that petitioner's murder conviction, of which he had just heard, would not be relevant to his guilt or innocence in the present case, since "[w]e are not trying him for murder."

Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory, but the circumstances surrounding petitioner's trial are not at all of that variety. Petitioner attempts to portray them as inflammatory by reference to the publicity to which the community was exposed. The District Court found, however, that the news articles concerning petitioner had appeared almost entirely during the period between December 1967 and January 1969, the latter date being seven months before the jury in this case was selected. 363 F. Supp., at 1228. They were, moreover, largely factual in nature. Compare *Beck* v. *Washington*, 369 U. S. 541 (1962), with *Sheppard* v. *Maxwell, supra.*

The length to which the trial court must go in order

name],'—when you go into the jury room, sir, all these facts are going to influence your verdict?

"A. I imagine it would be.

"Q. And in fact, you are saying if Murphy didn't testify, and if he doesn't offer evidence, 'My experience of him is such that right now I would find him guilty.'

"A. I believe so."

to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality. In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it. In *Irvin* v. *Dowd,* for example, the Court noted that 90% of those examined on the point were inclined to believe in the accused's guilt, and the court had excused for this cause 268 of the 430 veniremen. In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt.[6] This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.

In sum, we are unable to conclude, in the circumstances presented in this case, that petitioner did not receive a fair trial. Petitioner has failed to show that the setting of the trial was inherently prejudicial or that the jury-selection process of which he complains permits an inference of actual prejudice. The judgment of the Court of Appeals must therefore be

*Affirmed.*

MR. CHIEF JUSTICE BURGER, concurring in the judgment.

I agree with MR. JUSTICE BRENNAN that the trial judge was woefully remiss in failing to insulate prospective jurors from the bizarre media coverage of this case

---

[6] If persons who were excused for other reasons also exhibited a disqualifying opinion as to guilt, petitioner has not so claimed.

and in not taking steps to prevent pretrial discussion of the case among them. Although I would not hesitate to reverse petitioner's conviction in the exercise of our supervisory powers, were this a federal case, I agree with the Court that the circumstances of petitioner's trial did not rise to the level of a violation of the Due Process Clause of the Fourteenth Amendment.

MR. JUSTICE BRENNAN, dissenting.

I dissent. *Irvin* v. *Dowd,* 366 U. S. 717 (1961), requires reversal of this conviction. As in that case, petitioner here was denied a fair trial. The risk that taint of widespread publicity regarding his criminal background, known to all members of the jury, infected the jury's deliberations is apparent, the trial court made no attempt to prevent discussion of the case or petitioner's previous criminal exploits among the prospective jurors, and one juror freely admitted that he was predisposed to convict petitioner.

During *voir dire,* petitioner's counsel had the following colloquy with that juror:

"Q. Now, when you go into that jury room and you decide upon Murphy's guilt or innocence, you are going to take into account that fact that he is a convicted murderer; aren't you?

"A. Not if we are listening to the case, I wouldn't.

"Q. But you know about it?

"A. How can you not know about it?

"Q. Fine, thank you.

"When you go into the jury room, the fact that he is a convicted murderer, that is going to influence your verdict; is it not?

"A. We are not trying him for murder.

"Q. The fact that he is a convicted murderer and jewel thief, that would influence your verdict?

"A. I didn't know he was a convicted jewel thief.

"Q. Oh, I see.

"I am sorry I put words in your mouth.

"Now, sir, after two or three weeks of being locked up in a downtown hotel, as the Court determines, and after hearing the State's case, and after hearing no case on behalf of Murphy, and hearing no testimony from Murphy saying, 'I am innocent, Mr. [Juror]'—when you go into the jury room, sir, all these facts are going to influence your verdict?

"A. I imagine it would be.

"Q. And in fact, you are saying if Murphy didn't testify, and if he doesn't offer evidence, 'My experience of him is such that right now I would find him guilty.'

"A. I believe so."

I cannot agree with the Court that the obvious bias of this juror may be overlooked simply because the juror's response was occasioned by a "leading and hypothetical question," *ante*, at 801. Indeed, the hypothetical became reality when petitioner chose not to take the stand and offered no evidence. Thus petitioner was tried by a juror predisposed, because of his knowledge of petitioner's previous crimes, to find him guilty of this one.

Others who ultimately served as jurors revealed similar prejudice toward petitioner on *voir dire*. One juror conceded that it would be difficult, during deliberations, to put out of his mind that petitioner was a convicted criminal. He also admitted that he did not "hold a convicted felon in the same regard as another person who has never been convicted of a felony," and admitted further that he had termed petitioner a "menace."

A third juror testified that she knew from several

sources that petitioner was a convicted murderer,[1] and was aware that the community regarded petitioner as a criminal who "should be put away." She disclaimed having a fixed opinion about the result she would reach, but acknowledged that the fact that petitioner was a convicted criminal would probably influence her verdict:

"Q. Now, if you go into that jury room and deliberate with your fellow jurors, in your deliberations, will you consider the fact that Murphy is a convicted murderer and jewel thief?

"A. Well, he has been convicted of murder. So, I guess that is what I would—

"Q. You would consider that in your verdict, right?

"A. Right.

"Q. And that would influence your verdict; would it not?

"A. If that is what you say, I guess it would.

"Q. I am not concerned about what I say, because if I said it, they wouldn't print it. It would influence your verdict?

"A. It probably would.

.          .          .          .          .

"Q. When you go into that jury room, you cannot forget the fact that it is Murph the Surf; that he is a convicted murderer, and a jewel thief—you can't put that out of your mind, no matter what they tell you; can you, ma'am?

---

[1] The juror stated that she acquired a portion of her knowledge of petitioner's criminal background from an article in that week's Miami Herald entitled "Defense Exhausts Jury Challenges in Murphy Trial," which included the sentence: "Jury selection will continue today in the trial of beach boy hoodlum serving a life sentence for murder in connection with the Whisky Creek slaying of two secretaries in 1968."

"A. Probably not.

"Q. And it would influence your verdict; right?

"A. Probably."

Still another juror testified that the comments of venire members in discussing the case had made him "sick to [his] stomach." He testified that one venireman had said that petitioner was "thoroughly rotten," and that another had said: "Hang him, he's guilty." [2]

Moreover, the Court ignores the crucial significance of the fact that at no time before or during this daily buildup of prejudice against Murphy did the trial judge instruct the prospective jurors not to discuss the case among themselves. Indeed the trial judge took no steps to insulate the jurors from media coverage of the case or from the many news articles that discussed petitioner's last criminal exploits.

It is of no moment that several jurors ultimately testified that they would try to exclude from their deliberations their knowledge of petitioner's past misdeeds and of his community reputation. *Irvin* held in like circum-

---

[2] A juror chosen as an alternate testified that she did not know whether she "would give the same fair and impartial treatment to a convicted killer as [she] would to another person." She added that she did not know whether she could be fair and impartial in her deliberations in the case:

"Q. The question is, would you compromise your verdict; could you go there—and say the State proved his guilt and the defense proved that he was insane, but, 'I'm not going to let that guy walk the streets, so I'm going to find him guilty, period?'

"Would you do that?

"A. I don't know at this point.

"Q. Right.

"So in fact, ma'am, at this point you cannot tell us whether you can give a fair and impartial deliberation about Murphy, number one, because of the lack of evidence; and number two, because of what you know about Murphy; isn't that a fact?

"A. Yes."

stances that little weight could be attached to such self-serving protestations:

> "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, 'You can't forget what you hear and see.'" 366 U. S., at 728.

On the record of this *voir dire*, therefore, the conclusion is to me inescapable that the attitude of the entire venire toward Murphy reflected the "then current community pattern of thought as indicated by the popular news media," *id.*, at 725, and was infected with the taint of the view that he was a "criminal" guilty of notorious offenses, including that for which he was on trial. It is a plain case, from a review of the entire *voir dire*, where "the extent and nature of the publicity has caused such a build up of prejudice that excluding the preconception of guilt from the deliberations would be too difficult for the jury to be honestly found impartial." *United States ex rel. Bloeth* v. *Denno,* 313 F. 2d 364, 372 (CA2 1963). In my view, the denial of a change of venue was therefore prejudicial error, and I would reverse the conviction.