PEOPLE v DeLISLE

Docket No. 133172. Submitted August 11, 1993, at Detroit. Decided
December 6, 1993, at 9:50 A.M. Leave to appeal sought.

Lawrence J. DeLisle was convicted by a jury in the Recorder's
Court for the City of Detroit, Robert J. Colombo, J., of four
counts of first-degree premeditated murder and one count of
attempted first-degree murder for having driven a vehicle
containing his wife and four children into a river. The four
children drowned. He was sentenced to five concurrent life
sentences. He appealed, alleging several errors.

The Court of Appeals *held:*

1. The evidence was sufficient to support the convictions, and
the verdict was not against the great weight of the evidence.

2. Under the totality of the circumstances, the trial court's
denial of the defendant's motion for a change of·venue based
upon pretrial publicity did not result in a denial of the defen-
dant's right to due process. The trial was fundamentally fair
and held before a panel of impartial jurors.

3. The trial court did not abuse its discretion in denying the
defendant's motion for a new trial based upon his belief that he
was denied due process as a result of being subjected to a
*hypnotic technique during interrogation by the police.* The
defendant argued that being subjected to the hypnotic tech-
nique irreparably tainted his decision regarding whether he
would testify at trial because it created an undue level of
uncertainty regarding how he would hold up under stringent
cross-examination. The defendant failed to make the requisite
showing on the record that his decision not to testify was based
upon his fear of how he might react to cross-examination given
his belief that he had been hypnotized.

4. The trial court did not abuse its discretion in excluding
evidence of other accidents caused by cars with mechanical
defects similar to the alleged defect in the defendant's car. The
relevance of such evidence was not proved.

5. The trial court did not deny the defendant due process by
refusing to allow him to impeach a police sergeant with a false
affidavit the officer had filed in an unrelated civil lawsuit.

6. The prosecutor's alleged appeal to the sympathy of the

jury was a proper response to previous pleas of sympathy made by defense counsel. If error occurred, no prejudice resulted.

7. The prosecutor's reference to a letter written by the defendant to his mother-in-law was not improper. The letter had been found to be more probative than prejudicial and had been admitted into evidence even though there was an alleged similarity between its contents and a confession by the defendant that had been ruled inadmissible.

8. The court did not err in instructing the jury that the defendant's car could be considered a dangerous weapon because, under the prosecutor's theory of the case, how the car was driven was a cause of the deaths, giving rise to an inference that the defendant acted with an intent to kill.

9. No error occurred when the defendant was not allowed to waive his right to a jury trial.

Affirmed.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of Research, Training, and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Peter Jon Van Hoek),* for the defendant on appeal.

Before: Taylor, P.J., and Hood and B. A. Jasper,* JJ.

Hood, J. Defendant was convicted by a jury of four counts of first-degree premeditated murder, MCL 750.316; MSA 28.548, and one count of attempted first-degree murder, MCL 750.91; MSA 28.286, following the highly publicized drowning deaths of his four children and the near death of his wife when the family's station wagon plunged into the Detroit River. Defendant received five

---

* Recorder's Court judge, sitting on the Court of Appeals by assignment.

concurrent life sentences, and appeals as of right. We affirm.

Defendant first argues that there was insufficient evidence to support the convictions. Specifically, he argues that there was insufficient evidence of intent. We disagree.

When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979). The question is whether the evidence presented at trial, together with all reasonable inferences arising therefrom, was sufficient to allow a rational trier of fact to find each element of the crime proven beyond a reasonable doubt. *Id.* This Court may not interfere with the jury's resolution of credibility disputes. *People v Vaughn,* 186 Mich App 376, 380; 465 NW2d 365 (1990).

First-degree murder is the intentional killing of another, done with premeditation and deliberation. *People v Coddington,* 188 Mich App 584, 599; 470 NW2d 478 (1991). The length of time necessary to "measure and evaluate a choice before it is made is incapable of precise determination"; all that is necessary is enough time to take a "second look" at the actions contemplated. *Id.* at 599-600. Premeditation and deliberation may be inferred from the circumstances, including the defendant's behavior before and after the crime. *Id.* at 600.

Here, the evidence showed that defendant drove to the site of the crash on the previous evening and earlier on the night of the crash. It also showed that, after stopping at a drugstore, defendant turned toward the river instead of toward his home, that he accelerated in a straight path toward the river, not braking and not hitting any parked cars that might have impeded his progress, and that, after about seven seconds, he managed

to drive between the posts of a barrier at the end of the street (a difficult accomplishment) and plunged into the river about forty feet from the bank. The evidence also showed that defendant surfaced quickly after the crash, which was inconsistent with his claim that he had a leg cramp. His quick exit from the car also tended to show that he had anticipated the crash and had planned to escape without pausing to help his family. This evidence, viewed in the light most favorable to the prosecution, was sufficient to find beyond a reasonable doubt that defendant acted with intent to kill formed after premeditation and deliberation. There was therefore sufficient evidence to sustain defendant's convictions.

Next, defendant argues that the verdict was against the great weight of the evidence. We disagree.

We review a denial of a motion for a new trial based on a great weight of the evidence argument under an abuse of discretion standard. *People v Harris,* 190 Mich App 652, 658-659; 476 NW2d 767 (1991). The question is whether the verdict was manifestly against the clear weight of the evidence. *Id.* at 659. A verdict may be vacated only when it "does not find reasonable support in the evidence, but is more likely to be attributed to causes outside the record such as passion, prejudice, sympathy, or some extraneous influence." *Nagi v Detroit United Railway,* 231 Mich 452, 457; 204 NW 126 (1925). A new trial may therefore be granted when the verdict has resulted in a miscarriage of justice. See MCR 6.431(B); see also MCL 770.1; MSA 28.1098.

The evidence presented at trial did not clearly weigh in defendant's favor. Rather, although his claim that there were mechanical problems with the car was supported, these mechanical problems

were not shown to consistently cause the car to accelerate out of control. The evidence therefore presented a credibility contest regarding whether the car had indeed malfunctioned and whether defendant really had a leg cramp, and also regarding defendant's intent. As noted by the trial court, resolving credibility questions is the exclusive province of the jury even where the trial court would have reached a different result. See *Nagi, supra* at 457; see also *King v Taylor Chrysler-Plymouth, Inc,* 184 Mich App 204, 210; 457 NW2d 42 (1990). The trial court properly refused to vacate the verdict on this ground.

Defendant next argues that the trial court committed error requiring reversal in denying his motion for a change of venue based upon pretrial publicity. We again disagree.

The denial of a motion for a change of venue is reviewed for abuse of discretion. *People v Passeno,* 195 Mich App 91, 98; 489 NW2d 152 (1992). An abuse of discretion will be found only if an unprejudiced person would find no justification or excuse for the ruling made. We note that the trial court could have granted defendant a new trial on this basis but, although expressing concern over its earlier ruling regarding venue, refused to do so. See MCR 6.431(B); see also MCL 770.1; MSA 28.1098.

Defendant acknowledges the general rule that where potential jurors can swear that they will put aside preexisting knowledge and opinions about the case, neither will be a ground for reversing a denial of a motion for a change of venue. See *Passeno, supra* at 98-99; see also *People v Furman,* 158 Mich App 302, 321; 404 NW2d 246 (1987). However, he argues, the jury in this case was exposed to defendant's inadmissible "confession" through the media to such a great extent that

they could not be expected to set aside such knowledge. We disagree and, after a thorough review of the record, find no reason to disregard the jurors' assurances that they could render a fair and impartial verdict in this case. We reemphasize that when citizens have been sworn to tell the truth, and testify under oath that they can be impartial, the initial presumption is that they are honoring their oath and are being truthful.

Cases where jurors' protestations of impartiality have been disregarded are much more egregious than the present case. In *Irvin v Dowd,* 366 US 717, 727; 81 S Ct 1639; 6 L Ed 2d 751 (1961), for example, the Supreme Court reversed a conviction where the jury was chosen from a panel where almost ninety percent, 370 out of 420, of the prospective jurors who were asked the question admitted having an opinion about the case. In fact, two-thirds of the jury that convicted the defendant admitted having an opinion that he was guilty but claimed to be able to set it aside and render an impartial verdict. *Id.* at 727-728. The Court stated that "[n]o doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." *Id.* at 728.

Cases where publicity is presumed to have had an effect on the jury are similarly outrageous. In *Rideau v Louisiana,* 373 US 723, 727; 83 S Ct 1417; 10 L Ed 2d 663 (1963), the United States Supreme Court reversed the defendant's conviction, "without pausing to examine a particularized transcript of the *voir dire,*" holding that "due process of law in this case required a trial before a jury drawn from a community of people who had not seen and

heard [the defendant's] televised 'interview.' " In *Rideau,* the defendant's confession was televised three times about two weeks before the arraignment to audiences of twenty-four thousand, fifty-three thousand, and twenty-nine thousand people in a parish with a population of about 150,000. *Id.* at 724. However, only three of the jurors who decided the case admitted having seen the "interview."[1] *Id.* at 725.

In *Rideau,* there was no evidence that the defendant's confession was procured through violence or psychological pressure. *Id.* at 726. He was, however, "interviewed" by the sheriff without the assistance of counsel. *Id.* at 727. The opinion did not discuss the admissibility of the defendant's confession.

In *Estes v Texas,* 381 US 532; 85 S Ct 1628; 14 L Ed 2d 543 (1965), the Supreme Court presumed prejudice and reversed the defendant's conviction where pretrial hearings were carried live on radio and television, there were at least twelve cameramen in the courtroom during the proceedings and cables and wires were snaked everywhere, and the activities of television crews and news photographers created considerable disruption.

In *Sheppard v Maxwell,* 384 US 333; 86 S Ct 1507; 16 L Ed 2d 600 (1966), the defendant's conviction was reversed where the coroner, with the prosecutor and two bailiffs, held a televised three-day inquest of the defendant in a school gymnasium, during which the defendant was publicly searched and the defendant's attorney was not allowed to participate.

Contrary to defendant's arguments, these cases "cannot be made to stand for the proposition that juror exposure to information about a state defen-

---

[1] Two other jurors were deputy sheriffs in the parish where defendant was tried. *Rideau, supra* at 725.

dant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process" and therefore entitles him to a change of venue. *Murphy v Florida,* 421 US 794, 799; 95 S Ct 2031; 44 L Ed 2d 589 (1975). Rather, as stated by Justice MARSHALL, writing for the majority in *Murphy,* those convictions were reversed because "[t]he proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Id.* Whether a defendant's conviction will be reversed depends on whether, under the "totality of circumstances," the defendant's trial "was not fundamentally fair" and held before "a panel of impartial, 'indifferent' jurors." *Id.*

The Court stressed in *Murphy* that even the existence of preconceived notions regarding guilt or innocence is not enough to rebut the presumption of impartiality where the juror states that those opinions can be set aside and the case can be decided on the evidence presented at trial. *Id.* at 800; see also *Gentile v State Bar of Nevada,* 501 US —, —; 111 S Ct 2720, 2734; 115 L Ed 2d 888 (1991) ("[o]nly the occasional case presents a danger of prejudice from pretrial publicity. Empirical research suggests that in the few instances when jurors have been exposed to extensive and prejudicial publicity, they are able to disregard it and base their verdict upon the evidence presented in court.")[2] On the other hand, "it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy, supra* at 800, quoting *Doud, supra* at 723.

[2] In *Gentile,* the issue was the constitutionality of a state bar association rule prohibiting defense counsel from discussing pending cases with the media. 501 US —; 111 S Ct 2724.

Indicia of impartiality—such as a professed lack of knowledge about the case or claims that an opinion could be set aside—might be disregarded where the general atmosphere in the community or the courtroom is sufficiently inflammatory. *Murphy, supra* at 802. Further, "[i]n a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it." *Id.* at 803.

In *Murphy,* for example, twenty of the seventy-eight persons in the venire were excused for bias. *Id.* As indicated by the Court, however, that number "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* The Court also noted that media coverage had stopped "almost entirely" about seven months before the trial. *Id.* at 802; see also *Patton v Yount,* 467 US 1025, 1032; 104 S Ct 2885; 81 L Ed 2d 847 (1984) (in the year and a half between reversal of the first conviction and the defendant's retrial, only an average of one story a month was published about the case); *Beck v Washington,* 369 US 541, 556; 82 S Ct 955; 8 L Ed 2d 98 (1962) (publicity had greatly diminished in the five months between the defendant's indictment and his trial). Additionally, although all the jurors in *Murphy* had gained some knowledge of the defendant's prior record through the media and some had a vague recollection of the facts of the crime, none had a preconceived notion of the defendant's guilt. *Murphy, supra* at 800; see also *Mu'Min v Virginia,* 500 US —, —; 111 S Ct 1899, 1903; 114 L Ed 2d 493 (1991) (although eight of the

defendant's twelve jurors "had at one time or another read or heard something about the case," "[n]one had indicated that he had formed an opinion about the case or would be biased in any way");[3] *Beck, supra* at 557 (although most jurors selected had been exposed to publicity about the case, all said they were unbiased and therefore met more than the minimal standard of impartiality required). The present case is indistinguishable from *Murphy.*

Here, sixty-eight potential jurors were interviewed during voir dire. Of these, twenty-one were excused because of bias against defendant, and one was excused because he had secretly made plans to visit the crash site. Five potential jurors were excused for hardship. Thus, as in *Murphy,* less than a third of the venire was excused for prejudice.

Defense counsel exercised ten of his fifteen peremptory challenges.[4] He struck four of the five jurors he had unsuccessfully challenged for cause.[5] The prosecutor exercised six of his twelve peremptory challenges.

Of the fourteen jurors seated, all had heard about the general facts of the case. Five had heard about the confession; one of these five had also heard about the candle incident.[6] All of these five

[3] In *Mu'Min,* the issue was whether due process was violated by the trial court's refusal to ask prospective jurors about the contents of news reports they had seen or heard. 500 US —; 111 S Ct 1902.

[4] The fact that defendant did not exercise all of his peremptory challenges does not evidence defendant's satisfaction with the composition of the jury where defense counsel clearly expressed otherwise and explained his strategic choice to get the best panel possible given the denial of his motion for a change of venue.

[5] The fifth potential juror that the defense unsuccessfully challenged for cause was not called up to sit in the jury box while the parties were exercising their peremptory challenges.

[6] It was reported in the press that, several years earlier, defendant had left a lit candle next to a clothes dryer that was leaking gas. References to this incident were excluded at trial.

remained on the jury after the two alternates were excused.

As in *Murphy,* all of the jurors chosen denied having formed an opinion regarding defendant's guilt. All stated that their memories of the case were vague because of the lapse of time. All promised to be fair and to decide the case solely on the basis of the evidence introduced at trial.

The exhibits introduced in support of defendant's motion for a change of venue showed that there were thirty-seven articles published about the incident in August of 1989. There were fifteen articles published in September, eight in October, and five in November. Twelve articles were published in December and nineteen in January of 1990. There were four articles published in February, one in March, none in April, and two in May.[7]

The tone of the news articles became inflammatory shortly after the incident. There was also considerable coverage regarding defendant's confession and whether it would be released to the media. Once the media had access to the confession, in the first two weeks of January 1990, long excerpts of it were printed in the newspapers. However, that coverage was short-lived.

During the 5½ months preceding the trial, news coverage focused on the status of the case and not on its facts. For example, after January 17, 1990, there were only two articles published about the case: one about the motion to change venue and one about Sergeant Galeski. In February, there were two articles published concerning whether defendant's mother-in-law was competent to testify, one about the motion to change venue, and

---

[7] There were also twenty-eight articles published in June, while the trial was in progress. However, the jury was chosen on June 6 through 8, 1990. Further, prospective jurors had been advised in May not to read, watch, or listen to any news coverage about the case.

one about the fact that oral argument had been scheduled in the appeal regarding the admissibility of defendant's confession. There was one article published in March concerning that oral argument, and two were published in May regarding this Court's decision to uphold the exclusion of the confession. Thus, and again as in *Murphy,* inflammatory news coverage had basically stopped after January 17, 1990, almost six months before the jury was selected.

In sum, we find no showing of the kind of improper proceedings that may sometimes lead to automatic reversal. Voir dire demonstrated that the jurors chosen, although familiar with the case, were not biased against defendant. Further, the media coverage during the 5½ weeks preceding the trial failed to reveal the kind of inflammatory community atmosphere that might sometimes justify disregarding the jurors' claims of impartiality. Likewise, the number of jurors excused for bias during voir dire was not sufficiently high to presume that the jurors chosen were part of a community deeply hostile to defendant. Under the totality of the circumstances, defendant's due process rights were not violated by the trial court's denial of his motion for a change of venue. His trial was fundamentally fair and held before a panel of impartial jurors.

Next, defendant argues that he should have been granted a new trial on the ground that he was denied due process because the hypnotic technique to which the police subjected him during interrogation "irreparably tainted the decision on whether he would testify at trial" by creating "an undue level of uncertainty regarding how [defendant] would hold up under stringent cross-examination." We disagree.

The transcript of the trial court's December 21,

1989, findings of fact regarding the voluntariness of defendant's confession was somehow not included in the lower court record forwarded to this Court. We therefore cannot determine whether the trial court indeed found that defendant had been hypnotized during the interrogation.[8] Nevertheless, we agree with the trial court that defendant's claim would, at a minimum, require a preliminary showing by way of an affidavit that defendant's decision not to testify was based upon his fear of how he might react to cross-examination given his belief that he had been hypnotized. Because there was no such preliminary showing on the record, we find that the trial court did not abuse its discretion in denying defendant's motion for a new trial on this basis.

Defendant also contends that he was denied due process by the trial court's refusal to allow him to introduce evidence of other accidents caused by cars with mechanical defects similar to his. We again disagree.

Defendant's proffer of proof was insufficient to establish the relevancy of evidence of other accidents. Defendant failed to show that the other vehicles were of the same year and model as defendant's station wagon or that they were equipped with the same type of engine. The trial court therefore did not abuse its discretion in excluding this evidence.

Defendant further argues that the trial court deprived him of due process by refusing to allow him to impeach Sgt. Galeski with a false affidavit

[8] During the appeal of the trial court's decision to exclude defendant's confession, "[t]he prosecution argue[d] that the record d[id] not support a finding that defendant was hypnotized." *People v Delisle,* 183 Mich App 713, 720; 455 NW2d 401 (1990). We noted that such a finding was not necessary to upholding the court's decision that the confession was involuntary and affirmed. *Id.*

that the officer had filed in an unrelated civil lawsuit. We disagree.

Despite defendant's argument to the contrary, the only damaging testimony given by Sgt. Galeski concerned whether defendant's car had accelerated out of control during one of the mechanical tests conducted by the police. The officer's testimony on that point was thoroughly impeached both by his own notes and by the testimony of other prosecution and defense witnesses. Therefore, any error in excluding the impeachment evidence—and we do not find any—was harmless.

Defendant next claims that he should have been granted a mistrial because the prosecutor appealed to the sympathy of the jury during closing argument. We again disagree.

The prosecutor told the jury to "hold [defendant] responsible based on the evidence. Not on the tears of counsel or anybody else. Because who cries for [the children]?" Although that statement may, at first blush, appear as a plea for sympathy, it was a proper response to previous pleas of sympathy made by defense counsel. Further, even if erroneous, there was no prejudice because the prosecution also urged the jury to base its decision on the evidence and because the court instructed the jury that comments of counsel were not evidence and could not be used in deciding defendant's guilt or innocence.

Defendant also claims that the prosecutor made veiled references to defendant's inadmissible confession. We again disagree. The prosecutor's argument, on its face, referred to a letter written by defendant to his mother-in-law that was introduced into evidence and was, therefore, a proper target for the prosecutor. Once that letter was found to be more probative than prejudicial and was admitted into evidence, any similarity be-

tween its content and that of defendant's confession did not preclude the prosecutor from making an otherwise proper argument.

Defendant next argues that the trial court erred in stating, in its instructions to the jury, that defendant's car could be considered a dangerous weapon. We again disagree.

CJI 16:1:08, now CJI2d 16.21, states that an instrument designed for peaceful purposes can be a dangerous weapon if it is "used in a manner reasonably calculated and likely to produce serious physical injury or death." It further allows the jury to infer intent to kill from the use of a dangerous weapon. Defendant contends that the instruction should not have been given because it was overly prejudicial given that the prosecutor did not argue that the car was a dangerous weapon. This argument overlooks the fact that how the car was driven was, under the prosecutor's theory of the case, a cause of death. How the car was driven could therefore properly give rise to the inference that defendant acted with intent to kill. There was no error.

Lastly, defendant argues that, despite MCL 763.3(1); MSA 28.856(1), he should have been allowed to waive his right to a jury over the prosecutor's objection. This argument has been rejected by our Supreme Court. See *People v Kirby,* 440 Mich 485, 495; 487 NW2d 404 (1992). There was therefore no error.

Affirmed.