# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MARY LOU BIGFORD,

Defendant-Appellant.

UNPUBLISHED
November 21, 2017

No. 333493
Isabella Circuit Court
LC No. 15-000786-FC

Before: O'CONNELL, P.J., and MURPHY and K. F. KELLY, JJ.

PER CURIAM.

Defendant, Mary Lou Bigford, appeals as of right her convictions, following a jury trial, of first-degree premeditated murder, MCL 750.316(1)(a), carrying a weapon with unlawful intent, MCL 750.226, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). The trial court sentenced defendant to serve concurrent prison terms of life without parole for the first-degree murder conviction and 40 months to 5 years for the carrying a weapon with unlawful intent conviction, to be served consecutive to a two-year term of imprisonment for the felony-firearm conviction. We affirm.

## I. FACTUAL BACKGROUND

On April 18, 2015, Lawrence Howard was shot to death in the parking lot of an apartment complex, where he had gone to pick up his daughter for weekend visitation. Multiple witnesses testified that a person who drove the same style of lime green Aztek as defendant walked up to Howard as he sat in his car and shot him six times at close range.

Howard had been involved in a custody dispute with defendant's daughter, during which allegations were made that he had sexually abused his child—defendant's grandchild. A forensic interview and medical examination of the child provided no evidence of sexual abuse, though multiple family friends testified at trial that the child had disclosed sexual abuse to them. Detective Dale Rauch testified that a criminal investigation into the allegations was ongoing at the time of the shooting. Detective Don Systema testified that Howard had filed for full custody of the child in Ohio, and a condition of the Ohio court postponing a hearing on the motion was that Howard receive visitation with the child over the weekend.

Pretrial publicity in this case included at least three newspaper articles, discussion on social media, and the case being in the news on both television and the radio. As a result, the

-1-

trial court engaged in individual voir dire of the jurors for defendant's trial. Two mistrials occurred before defendant was tried and found guilty of the offenses previously described.

## II. CHANGE OF VENUE

Defendant first argues that the trial court erred by denying her motion to change venue on the basis of pretrial publicity. We disagree.

This Court reviews for an abuse of discretion whether the trial court erred by denying a defendant's motion for change of venue. *People v Lee*, 212 Mich App 228, 252; 537 NW2d 233 (1995). The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013). The trial court also abuses its discretion when it makes an error of law. *Id*. at 723.

As an initial matter, the prosecution argues that defendant waived this issue. The prosecution, however, confuses the nature of the alleged error with the *result* of that error. The alleged *error* is the denial of defendant's motion to change venue; the alleged *result* is that an impartial jury was seated. We will not regard defendant's participation in the jury selection process after the trial court denied an objection as a waiver of the issue. See, e.g., *In re Dunn's Estate*, 245 Mich 270, 273; 222 NW 194 (1928); *People v Garland*, 393 Mich 215, 219 (agreeing with waiver analysis in LEVIN, J.'s concurrence), 223 (opinion by LEVIN, J.); 224 NW2d 45 (1974).

The prosecution relies on *People v Daniels*, 192 Mich App 658; 482 NW2d 176 (1991), to argue that defendant waived this issue by expressing satisfaction with the jury that was ultimately seated. In *Daniels*, the issue on appeal was whether the defendant's right to an impartial jury had been violated because of the trial court's denial of a request to question the jury regarding possible racial prejudice. *Id*. at 666. This Court held that the issue was waived because the "defendant expressed satisfaction with the jury with five of his twenty peremptory challenges unused." *Id*. at 667. The instant case is distinguishable from *Daniels*, which concerned an issue regarding the trial court's decision to disallow the defendant from questioning the jury venire about racial prejudice, whereas the issue in this case concerns a challenge to venue that defendant raised below. Defendant argued that no amount of questioning could reveal the jurors' preexisting biases because "there [were] a number of prospective jurors [sic] who are motivated to lie in order to serve on the jury panel."

Additionally, in *Daniels*, the defendant expressed satisfaction with the jury. Defendant in this case did not express satisfaction with the jury, but instead simply failed to exhaust her peremptory challenges. In pertinent part, jury selection ended with the following exchange:

> *THE COURT*: Peremptory, Ms. Hunt-Scully?
>
> *MS. HUNT-SCULLY [the prosecutor]*: None.
>
> *THE COURT*: Peremptory, Ms. Spencer-Noggle?
>
> *MS. SPENCER-NOGGLE [defense counsel]*: None.

-2-

*THE COURT*: Okay the, we do have a jury then. For those of you who have not been chosen . . . . [Tr XV, 164.]

Thus, while defendant failed to exhaust her peremptory challenges, she did not in fact express satisfaction with the jury. This case is more similar to *People v Taylor*, 195 Mich App 57; 489 NW2d 99 (1992), in which this Court concluded that the defendant had not waived a change-of-venue issue when the defendant, although failing to exhaust her peremptory challenges, did not express satisfaction with the jury and alleged that exercising her peremptory challenges would have been "pointless, because it could not have prevented the error, eliminated its prejudice, or further demonstrated the error and its prejudice." *Id*. at 59-60. We therefore conclude that defendant here has not waived this issue.

However, we reject defendant's challenge on the merits. A criminal defendant has both state and constitutional rights to be tried by an impartial jury. *People v Miller*, 482 Mich 540, 547; 759 NW2d 850 (2008); see also US Const, Am VI; Const 1963, art 1, § 20. "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v Dowd*, 366 US 717, 722; 81 S Ct 1639; 6 L Ed 2d 751 (1961). While a juror who has formed an opinion about the matter on trial cannot be impartial, "[i]t is not required, however, that jurors be totally ignorant of the facts and issues involved." *Id*. A juror is sufficiently impartial if he or she states an ability to set aside a preexisting opinion and render a verdict on the basis of only the evidence presented in court. *Id*. at 723.

When jurors have sworn to tell the truth and testify under oath that they can be impartial, this Court presumes that those jurors will honor their oath. *People v DeLisle*, 202 Mich App 658, 663; 509 NW2d 885 (1993). A defendant seeking to show the contrary must show the "actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Id*. at 665 (quotation marks and citations omitted).

"The existence of pretrial publicity, standing alone, does not necessitate a change of venue." *Lee*, 212 Mich App at 253. A defendant seeking to show that the trial court's failure to change venue denied him or her an impartial trial must show either (1) a strong pattern of community feeling due to such extensive, inflammatory publicity that "jurors could not remain impartial when exposed to it" or (2) "that the jury was actually prejudiced or the atmosphere surrounding the trial was such as would create a probability of prejudice." *People v Passeno*, 195 Mich App 91, 98; 489 NW2d 152 (1992), vacated in part on other grounds by *People v Bigelow*, 229 Mich App 218, 220 (1998).

Cases in which jurors cannot remain impartial are only the most egregious of cases. *DeLisle*, 202 Mich App at 663. For instance, in *Irwin*, 370 of 420 prospective jurors admitted that they had an opinion about the case, and 286 were excused for cause because they had "fixed opinions" that the defendant was guilty. *Irwin*, 366 US at 727-728. Conversely, when 20 of 78 members of the venire were excused for partiality, the United States Supreme Court concluded that the defendant had not shown a strong pattern of community feeling. *Murphy v Florida*, 421 US 794, 803; 95 S Ct 2031; 44 L Ed 2d 589 (1975). And in *DeLisle*, where 21 of 68 potential jurors were excused because of bias against the defendant, this Court concluded that there was not a sufficient proof of community feeling. *DeLisle*, 202 Mich App at 667.

-3-

In this case, the vast majority of venire members of all three trials had stated that they had heard something about the case. At defendant's first trial, of the 69 individually questioned jurors, 49 indicated that they had heard something about the case. Of those 49 jurors, only nine jurors indicated that they had formed an opinion about the case and only six jurors stated that they could not set their opinions aside. At defendant's second trial, of the 112 individually questioned jurors, 55 jurors indicated that they had heard something about the case. Of those 55 jurors, only eight stated that they had formed an opinion about the case and only three indicated that they could not set their opinions aside.[1] Unlike the cases previously cited, in this case, at the time the trial court ruled on defendant's motion to change venue, only a small number of potential jurors indicated that they had formed opinions about defendant's guilt, and a smaller number had indicated that they could not set those opinions aside.

Cases in which the jury has been actually prejudiced or may be presumed prejudiced by the pretrial atmosphere are "similarly outrageous." *DeLisle*, 202 Mich App at 663. *Sheppard v Maxwell*, 384 US 333, 339-340; 86 S Ct 1507; 16 L Ed 2d 600 (1966), involved a televised three-day inquest after an article was published stating that the defendant was being allowed to get away with murder, at which the defendant was publically searched, he was not allowed to have an attorney, and he was not allowed to present evidence. The local newspapers also published the names and addresses of the venire members, who received numerous anonymous letters and phone calls. *Id.* at 342. In *Estes v Texas*, 381 US 532, 536; 85 S Ct 1628; 14 L Ed 2d 543, reh den 382 US 875 (1965), there were 12 cameras present in the courtroom at trial, "cables and wires snaked across the courtroom floor," microphones were aimed at the judge's bench, jury box, and counsel table, and it was "conceded that the activities of the television crews and news photographers led to considerable disruption of the hearings." The resulting coverage included "[m]assive pretrial publicity totaling 11 volumes of press clippings" and hearings carried live both on television and on the radio. *Id*. at 535-536. And in *Rideau v Louisiana*, 373 US 723, 724; 83 S Ct 1417; 10 L Ed 2d 663 (1963), the defendant's confession was televised three times to tens of thousands of people each time.

In this case, there is no evidence of a similarly outrageous pretrial atmosphere. Multiple news stations covered defendant's arraignment, but there is no indication that the hearing itself was carried live on either television or the radio, or that the hearing was broadcast in its entirety later. There is also no indication that the names and addresses of venire members were made known. Media coverage was allowed into the courtroom during trial, but a single broadcaster and two photographers are not the equivalent of the disruption caused by 12 cameras and numerous microphones at the start of trial, as occurred in *Rideau*.

Regarding the volume of articles reporting the case, defendant provided no offer of proof regarding print media coverage, and there is no indication of how many news articles were

---

[1] During jury selection preceding defendant's third trial, of the 68 jurors the trial court individually questioned among the eventual trial venire of jurors, 57 indicated that they had heard something about the case. Of those 57, only 13 had formed opinions about the case and only nine had formed opinions they could not set aside.

published or what those articles contained. It is clear from juror responses during voir dire that there was at least a front-page newspaper article on the day after the shooting and at least three articles before the first jury selection. Jurors also indicated that the case was "in the news" on both the radio and television and that people were posting and commenting about it on social media. However, there is no indication that this case involved the type of outrageously massive pretrial publicity that would have prevented a jury from impartially deciding the case.

While it is not legally required that jurors be ignorant of the facts of a matter in order to be impartial, *Irvin*, 366 US at 722, a review of the prospective jurors' responses during voir dire indicates that the majority of prospective jurors in each venire had only limited information about the case. In the first venire of 69 people, only 17 people knew that defendant was accused of shooting her granddaughter's father, and 19 knew that the case involved alleged child abuse or molestation (25% and 28%, respectively). And in the second venire of 112 people, only 18 people knew that defendant was accused of shooting her granddaughter's father, and 34 knew that the case involved child abuse or molestation (16% and 31%, respectively). At the time the trial court decided defendant's motion to change venue, there was no indication that this was the type of egregious case for which extensive media coverage had created such a pattern of community feeling that jurors could not remain impartial when exposed to it.[2]

While defendant argues that the media coverage in this case was shocking and polarizing, she failed to provide proof of the allegedly shocking and polarizing coverage. The party seeking reversal on appeal has the burden of providing the court with a record that establishes the factual basis of his or her argument. *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). By failing to provide evidence of the alleged shocking media coverage, defendant has failed to establish the factual basis of her argument.

Regardless, it is clear in reading the jurors' responses to individual voir dire questions that the issues in this case were indeed polarizing. However, defendant has not established that these issues are polarizing *because of* media coverage such that a change in venue would have remedied the problem. This case involved issues to which people are likely to have visceral responses on a variety of levels—child sexual abuse, killing to protect children from abuse, and the shooting of a black man by a white vigilante. Several jurors stated that they had strong opinions against child abuse. In some instances, those opinions were strong enough to disqualify jurors, and the opinions against child abuse generally were about equal in number to those jurors who stated that they had formed opinions of the case. A change in venue would not have made the underlying issues less polarizing.

---

[2] In the jury venire for defendant's third trial, of the 68 jurors the trial court individually questioned, 36 knew that the case involved a shooting, killing, or that defendant was accused of having shot her granddaughter's father, and 25 knew that the case involved alleged child abuse or molestation. However, the trial court had called 175 potential jurors and only individually questioned those who responded in certain ways to a questionnaire, unlike in the previous selections during which all prospective jurors were individually voir dired.

Finally, the second mistrial involved a juror stating that she had overheard another woman say that "she would have shot the son of a b***h herself, she's a grandmother." In reviewing the transcript of the proceedings immediately preceding the mistrial, it is clear that the mistrial did not concern media coverage, but instead concerned these more general, preexisting biases that would have presented issues regardless of the venue of the jury. The mistrial was granted not because the jury was actually impartial, but because the jurors had violated their oath not to discuss the case with each other and because the accusation that the jury was partial had likely tainted the jury. The second mistrial provides no proof that media coverage caused this prejudice.

We therefore conclude that the trial court did not abuse its discretion by denying defendant's motion to change venue under the circumstances of this case.

### III. JURY INSTRUCTIONS

Defendant next argues that the trial court erred by denying her request for a jury instruction on defense of others. We disagree.

This Court reviews for an abuse of discretion the trial court's decision regarding whether a specific jury instruction applies to the facts of a case. *People v Armstrong*, 305 Mich App 230, 239; 851 NW2d 856 (2014). "The trial court abuses its discretion when its outcome falls outside the range of principled outcomes." *Id*. This Court reviews de novo questions of law, including whether an instructional error violated a defendant's constitutional rights. *People v Wilder*, 485 Mich 35, 40; 780 NW2d 265 (2010).

"A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). "The jury instructions must include all elements of the crime charged, and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them." *Armstrong*, 305 Mich App at 240 (quotation marks and citation omitted).

Under Michigan common law, "the killing of another in self-defense is justifiable homicide if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." *People v Heflin*, 434 Mich 482, 502; 456 NW2d 10 (1990). A defendant may also use deadly force in the defense of another, or to repel an imminent, forcible sexual penetration. *People v Kurr*, 253 Mich App 317, 321; 654 NW2d 651 (2002). These common-law precepts have been codified in MCL 780.972,[3] which states:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

---

[3] Except as provided in MCL 780.972, the common law of this state remains unmodified. MCL 780.973.

* * *

(b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of . . . another individual.

"[W]here a threatened attack is not *imminent*, the person being threatened may not lawfully exercise deadly force in self-defense." *Riddle*, 467 Mich at 129 n 21.

In this case, the trial court did not abuse its discretion by determining that a defense of others jury instruction did not apply to the facts in this case. "[T]hreats of future harm do not constitute imminent danger for the purposes of self-defense." *People v Guajardo*, 300 Mich App 26, 42; 832 NW2d 409 (2013). Imminent means "ready to take place[.]" *Merriam Webster's Collegiate Dictionary* (11th ed).

Even presuming that the child was present with defendant when she shot Howard[4] and was to be placed in his custody, and even presuming that Howard had sexually assaulted the child in the past, there was no indication that Howard was in any position to immediately sexually assault the child. Howard was in a car in a parking lot and he had driven a lengthy distance, more than an hour and a half, to pick up the child. Additionally, as the trial court noted, even presuming that Howard had sexually assaulted the child in the past, there was no indication that he would do so in the immediate future given that a police investigation into his behavior was pending. The trial court's determination that a defense of others instruction did not apply to the facts of this case did not fall outside the range of reasonable and principled outcomes.

## IV. DOUBLE JEOPARDY

Defendant also argues that the trial court violated her right to not be put twice in jeopardy for the same offense when it permitted the prosecution to retry her case after the first mistrial. We disagree.

To preserve an issue, a party must raise it before the trial court on the same grounds as he or she challenges it on appeal. *People v Kimble*, 470 Mich 305, 309; 684 NW2d 669 (2004). Defendant did not raise or argue any issues of double jeopardy below. Therefore, this issue is unpreserved. Generally, "[a] double jeopardy challenge presents a question of constitutional law that this Court reviews de novo." *People v Smith*, 478 Mich 292, 298; 733 NW2d 351 (2007). However, this Court reviews unpreserved issues of constitutional error for plain error. *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009). An error is plain if it is clear or obvious. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

The Fifth Amendment of the United States Constitution protects a criminal defendant from being "twice put in jeopardy of life or limb . . . ." *People v Szalma*, 487 Mich 708, 715-716; 790 NW2d 662 (2010), quoting US Const, Am V (quotation marks omitted). The Michigan

---

[4] This point was disputed at trial.

Constitution contains a parallel provision, see Const 1963, art 1, § 15, that this Court construes consistently with the Fifth Amendment. *Szalma*, 487 Mich at 716.

In part, this provision protects a criminal defendant against multiple prosecutions for the same offense. *People v Lett*, 466 Mich 206, 214, 215; 644 NW2d 743 (2002). The trial court implicates this right when it declares a mistrial after the jury is selected and sworn. *Id.*; see also *United States v Scott*, 437 US 82, 92-93; 57 L Ed 2d 65; 98 S Ct 2187 (1978). However, "the Double Jeopardy Clause does not bar retrial where the prosecutor or judge made an innocent error or where the cause prompting the mistrial was outside their control." *People v Dawson*, 431 Mich 234, 252; 427 NW2d 886 (1988) (citations omitted). "Where a mistrial results from apparently innocent or even negligent prosecutorial error, or from factors beyond his control, the public interest in allowing a retrial outweighs the double jeopardy bar." *Id.* at 257 (citation omitted).

The record does not support that the prosecution intentionally provoked a mistrial. When determining whether the prosecutor intentionally provoked a mistrial, courts should consider the objective facts and circumstances of the case because subjective intent is difficult to determine. *Id.* at 254. In *Dawson*, the Michigan Supreme Court determined that the Double Jeopardy Clause barred retrial when "[t]he prosecutor's case was going badly," the prosecutor appeared to be stalling for time, the prosecutor asked a clearly improper question, and the prosecutor did not oppose the defendant's motion for mistrial. *Id.* at 258-259.

In this case, the prosecutor failed to timely provide a lab report as discovery. Defense counsel moved to exclude the evidence during opening statements and the prosecutor opposed the motion. The trial court explicitly stated that it did not know "if there's inadvertence" but found that the evidence was critical to the case. The prosecutor's conduct during voir dire was improper, but not clearly so—defendant did not challenge that conduct. Because the errors occurred at the beginning of trial, there is no indication that the prosecutor's case was going badly, and the prosecutor opposed defense counsel's motion for a mistrial. The objective circumstances disclose that the mistrial occurred because of innocent or negligent prosecutorial errors.

Additionally, where defense counsel made or consented to the motion leading to the mistrial, the defendant has waived his or her double jeopardy claim unless the motion for mistrial was prompted by intentional prosecutorial misconduct. *Dawson*, 431 Mich at 253. In *People v McGee*, 469 Mich 956, 956; 670 NW2d 665 (2003), the Michigan Supreme Court reversed this Court's grant of a new trial because the record "reveal[ed] circumstances from which consent to the circuit court's declaration of mistrial can be inferred." In that case, defense counsel had "neither objected nor agreed with the court's conclusion that a mistrial was warranted," and this Court concluded that where defense counsel had not "explicitly indicated consent to the mistrial . . . we will not present consent in the absence of an affirmative showing." *People v McGee*, 247 Mich App 325, 333; 636 NW2d 531 (2001), overruled by *McGee*, 469 Mich 956 (2003).

In this case, as discussed earlier, there was no intentional prosecutorial misconduct and defendant made the motion that led to the mistrial. There is also no indication that defense counsel either asked for a mistrial or objected to the trial court's decision to grant a mistrial.

Accordingly, this case is analogous with *McGee* because defendant neither objected to nor agreed with the trial court's decision to grant a mistrial. Under these circumstances, defendant's consent to the declaration of a mistrial may be inferred. For these reasons, there was no plain error in the trial court's decision to retry defendant.

Affirmed.

/s/ Peter D. O'Connell
/s/ William B. Murphy
/s/ Kirsten Frank Kelly