# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LEVONNE JOMARRIO GREER,

        Defendant-Appellant.

UNPUBLISHED
January 22, 2015

No. 318286
Saginaw Circuit Court
LC No. 12-037967-FC

Before: TALBOT, C.J., and CAVANAGH and M. J. KELLY, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of first-degree premeditated murder, MCL 750.316a, conspiracy to commit first-degree premeditated murder, MCL 750.157a, eight counts of felony-firearm, MCL 750.227b, five counts of assault with intent to commit murder, MCL 750.83, and one count each of carrying a concealed weapon (CCW), MCL 750.227, carrying a dangerous weapon with unlawful intent, MCL 750.226, and discharging a firearm from a vehicle, MCL 750.23a. We affirm defendant's convictions and sentences, except for the sentence imposed for conspiracy to commit first-degree premeditated murder, which must be corrected to indicate the possibility of parole.

This case arises out of a shooting that resulted in the death of six-year-old Layla Jones. Jones was shot as she prepared to get into the back seat of her grandmother's car after spending the evening with friends and family at her aunt's house at 1115 Essling Street in Saginaw. She died shortly thereafter at a local hospital emergency room.

Defendant, Rico Saldana, Julian Ruiz, and Michael Lawrence spent the day of August 29, 2012 drinking rum and smoking marijuana at Saldana's house on Harold Street in Saginaw. At some point, they learned that Bobby Bailey, one of defendant's childhood friends, had been murdered earlier that day. Apparently another of defendant's friends, Chris Diggs, had been killed two years earlier. Saldana asked Ruiz to see if he could borrow his sister's Buick Skylark. After Ruiz picked up the car, he followed Saldana and defendant to a house on 19th Street, where Saldana parked the Dodge Avenger he was driving. The four men then got into the Skylark, with Saldana driving, defendant in the seat behind him, Ruiz next to defendant in the backseat, and Lawrence next to Saldana in the front passenger's seat. Defendant had a .40 caliber gun and Lawrence a .45 caliber gun.

-1-

After turning onto Essling Street, when one of the men in the car said, "there go somebody." Lawrence then reached across Saldana, who slowed the car to a roll as it approached the bottom of the driveway at 1115 Essling Street, and began firing out of the driver's side front window. Defendant fired out of the driver's side back window. The two men fired approximately 12 shots before Saldana accelerated down Essling. Ruiz testified that the Skylark was shot at. Although he was not certain if Lawrence and defendant shot before the Skylark was fired upon, he thought the latter was return fire as the Skylark accelerated down the street. Layla Jones was fatally injured.

After leaving the scene of the shooting, Saldana drove back to 19th Street, where he and defendant got back into the Avenger, and Ruiz and Lawrence drove the Skylark back to Saldana's house. Ruiz and Lawrence collected three shell casings from inside the Skylark and threw them into the sewer in front of Saldana's house. Later that evening, after Ruiz had returned the Skylark to his sister, defendant spoke with him on the telephone to make sure he had cleaned the car; when he said that he had not, defendant told him to clean the car with baby wipes. The next day, Saldana gave Ruiz a can of disinfectant and told him to use it to clean the car. Ruiz hid the disinfectant and towel he used in a doghouse behind his house.

Two days after the shooting, police arrested defendant and Saldana at a motel. Later that night, in a videotaped interview with Saginaw Police Department Detective Andrew Carlson, defendant confessed to his involvement in the shooting. The videotape of defendant's interview was played for the jury. The videotape also included several telephone conversations between defendant and his girlfriend and family members during which he admitted that he shot Layla Jones.

On appeal, defendant first claims a violation of his right to due process stemming from the trial court's admission of his videotaped confession into evidence. Defendant contends that his confession to Detective Carlson was made in reliance on the detective's promises of leniency and was, therefore, involuntary. "When reviewing a trial court's determination of voluntariness, this Court is required to examine the entire record and make an independent determination of the issue as a question of law." *People v Wells*, 238 Mich App 383, 386; 605 NW2d 374 (1999). The Court will affirm a trial court's decision unless it is left with a definite and firm conviction that a mistake was made. *People v Sexton (After Remand)*, 461 Mich 746, 752; 609 NW2d 822 (2000).

A criminal defendant's confession must be "free and voluntary." *People v Daoud*, 462 Mich 621, 632; 614 NW2d 152 (2000). It "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however, slight, nor by the exertion of any improper influence." *Id.* (internal quotation marks and citations omitted). "[M]ere adjurations or exhortations to tell the truth, without more, are insufficient to vitiate the voluntariness of a confession." *People v Conte*, 421 Mich 704, 740; 365 NW2d 648 (1984) (opinion by WILLIAMS, C.J.).

The test of voluntariness is whether, considering the totality of the circumstances, "the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired"

*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988) (internal quotation marks and citation omitted). Factors to be considered include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id.*]

We conclude from our review of the totality of the circumstances, in light of the *Cipriano* factors, that defendant's confession was voluntary. At the time he made the challenged statements, defendant was 22 years old, of at least average intelligence, and, by his own admission, experienced with the police. After being apprised of his *Miranda*[1] rights, defendant voluntarily waived them, and although the interview lasted over three hours, the length was not per se unreasonable. There is no evidence he was injured, intoxicated, drugged, or in ill health. He had something to eat at the police station prior to the interview, was not denied sleep or medical attention, and at no time was he physically abused or threatened with abuse. The record simply does not support the conclusion that defendant's will was overborne or his capacity for self-determination critically impaired. See *id*.

It is true that some of the statements Detective Carlson made could be interpreted as promises of leniency, suggesting defendant would achieve a more favorable outcome if he cooperated than otherwise. That defendant hoped for the detective's help is indisputable; that he confessed in reliance on it is not. Detective Carlson made no specific promises regarding charges or sentencing. For these reasons, we conclude that defendant's confession was voluntary, and affirm the trial court's admission of the taped confession into evidence.

Defendant also claims a due process violation based on prosecutorial misconduct. Specifically, defendant argues that two comments the prosecutor made during his closing and rebuttal arguments constitute improper appeals to the jury's sympathy. Our review of this unpreserved issue is for plain error affecting substantial rights. *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008).

"The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Green*, 228 Mich App 684, 693; 580 NW2d 444 (1998). Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial. *Brown*, 279 Mich App at 135. Error requiring reversal will not be found if the prejudicial effects of a prosecutor's comments could

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

have been cured by a timely instruction. *People v Mayhew*, 236 Mich App 112, 123, 600 NW2d 370 (1999).

"It is improper for a prosecutor to appeal to the jury to sympathize with the victim." *People v Dalessandro*, 165 Mich App 569, 581; 419 NW2d 609 (1988). Defendant identifies two specific comments he alleges were designed solely to appeal to jurors' sympathies. Referring to Layla Jones's family during his closing argument, the prosecutor said: "And their crime is they were having a family get-together. And their crime is that to celebrate her birthday, she got to visit her dad. And their crime is they were leaving to get back into the car so she could get back home to her mother." The second allegedly improper comment occurred during rebuttal argument, when the prosecutor said: "[Defense counsel] says there's no way—there's no way I can stand up and respond to what the prosecutor says. Well ladies and gentlemen I am going to tell you, there is no way this little girl is ever going to stand up and respond to anything."

We do not find reversible error here because the statements at issue arose from the evidence, were isolated, and were not so inflammatory as to prejudice defendant, particularly in light of the evidence. The prosecution's references to the "crime" of the family gathering foreshadowed what the prosecutor later makes explicit; namely, that as an act of revenge for the death of Bobby Bailey, defendant and his accomplice fired on the first group of people they saw, regardless of whether anyone in the group had been involved in the murder of Bailey.

The prosecutor's statement that Layla Jones is "not going to stand up and respond to anything," was an isolated, extemporaneous comment playing off of a statement made by defendant's counsel. This Court has found reversible error where a prosecutor has repeatedly referred to the victim in a manner clearly designed to elicit sympathy, see *Dalessandro*, 165 Mich App at 580-581, but has found harmless single references such as the one made in this case, *People v Watson*, 245 Mich App 572, 591; 629 NW2d 411 (2001). In any event, the comment, albeit emotional, was not so egregious that a curative instruction could not have cured any alleged prejudicial effect. *Green*, 228 Mich App at 693 (stating that "a well-tried, vigorously argued case should not be overturned on the basis of a few isolated improper remarks that could have been corrected had an objection been lodged"). Viewing the record as a whole, there are no grounds on which to suspect that the prosecutor's comments were outcome determinative or resulted in a miscarriage of justice.[2]

Defendant next argues, and the prosecutor agrees, that the trial court erred in sentencing defendant to life without the possibility of parole for conspiracy to commit first-degree premeditated murder. A person sentenced to a term of imprisonment for conspiracy to commit first-degree murder is eligible for parole. *People v Jahner (After Remand)*, 433 Mich 490, 504; 446 NW2d 151 (1989). The trial court here erred in sentencing defendant to life without the

---

[2] The court reminded the jury of their oath to "return a true and just verdict based only on the evidence and [the court's] instructions on the law." The court also told the jury that the lawyers' statements and arguments were not evidence. "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998).

possibility of parole. We remand the matter to the trial court for administrative correction of the error. MCR 6.429.

In his Standard 4 brief, defendant argues that he was deprived of effective assistance of counsel when his attorney failed to introduce into evidence jailhouse messages allegedly sent by Ruiz to defendant while the two were in jail. Whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact, and reviews de novo questions of constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012).

Defendant's argument that he was deprived of the effective assistance of counsel is without merit. Defendant contends that admission of the messages could have undermined Ruiz's credibility and supported his theory that he fired his gun in response to being fired on. No one testified with certainty regarding whether the Skylark was fired upon before or after defendant and Lawrence shot into the group of people on Essling. And although Ruiz allegedly wrote to defendant saying he "thought those guys shot first," Ruiz effectively repudiated this position at trial when he testified that he did not know who shot first, but thought the Skylark was fired upon after it left the scene. Moreover defendant told Detective Carlson that "[w]e shot our guns out the windows, and . . . they shot back." Regarding Ruiz's credibility, the jury heard that he had been drinking and smoking marijuana on the day of the incident, had supplied the car used during the shootings, had attempted to destroy evidence, and had received a lighter sentence in exchange for his cooperation. Given what the jury knew of Ruiz, it seems unlikely that his admission in one of the messages that he used cocaine on the day of the incident would have provided the quantum of evidence the jury needed to reject his testimony as unreliable. Thus, with no apparent advantage to be gained from entering the messages into evidence, defendant has not overcome the presumption that trial counsel's strategy was viable under the circumstances.

Defendant's next Standard 4 argument is that the trial court abused its discretion by failing to instruct the jury on the lesser included offense of voluntary manslaughter. We review claims of instructional error de novo. *People v Martin*, 271 Mich App 280, 337; 721 NW2d 815 (2006).

"When a defendant is charged with murder, the trial court must give an instruction on voluntary manslaughter if the instruction is supported by a rational view of the evidence." *People v Mitchell*, 301 Mich App 282, 286; 835 NW2d 615 (2013). "To show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *People v Mendoza*, 468 Mich 527, 535; 664 NW2d 685 (2003).

Defendant's counsel based his request for the instruction on the alleged presence of a third gun and the assumption that an anonymous shooter fired at the Skylark first. Counsel argued that a bullet fired to the left of the grandmother's vehicle differed in rifling from the other bullets found at the scene, thus indicating the presence of a third gun. He assumed that the anomalous bullet must have been fired first because it made no sense for the occupants of the Skylark to fire one bullet to the left of the grandmother's car before rolling on and firing the rest

-5-

of the bullets to the right side of her car. Therefore, defendant argues, an anonymous shooter with a third gun first fired at the car defendant was in, thus provoking defendant to fire recklessly out of the window.

Someone apparently did fire on the Skylark, but there is no definitive evidence to support defendant's assertion, predicated on a questionable assumption stemming from the location of a bullet, that the shooter fired first. Defendant never states in his interview with Detective Carlson that they fired because someone was firing at them. On the contrary, he indicated that they were not fired upon until they started to pull away. He told Detective Carlson: "We shot our guns out the windows, and, shit, they shot back. You know, I want to say he ran in the middle of the street and he started shooting." Defendant's statement aligns with Ruiz's testimony that the Skylark first came under fire as Saldana sped away from the scene. Based on the evidence presented at trial, the trial court did not err in denying defendant's request for a voluntary manslaughter instruction because a rational view of the evidence does not support such instruction. See *Mitchell*, 301 Mich App at 286.

Defendant's next Standard 4 issue is the assertion that the evidence was insufficient to support his conviction for first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, and assault with the intent to commit first-degree premeditated murder. Defendant does not argue that he did not conspire or commit assault. The gravamen of defendant's argument is that the record does not support a finding of a specific intent to kill or of deliberation. "In reviewing the sufficiency of the evidence in a criminal case, [this Court] must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt." *People v Hoffman*, 225 Mich App 103, 111; 570 NW2d 146 (1997).

"[F]irst-degree murder . . . is a specific intent crime requiring an intention to take a life." *People v Johnson*, 93 Mich App 667, 670; 287 NW2d 311 (1979), rejected in part on other grounds by *People v Williams*, 422 Mich 381; 373 NW2d 567 (1985). "Mere conscious indifference to the likelihood of death as a result of a person's intentional act is not enough; to commit first-degree murder, a person must act with the purpose of causing death." *People v Milton*, 81 Mich App 515, 518; 265 NW2d 397, amended on other grounds 403 Mich 821 (1978). Intent to kill may be inferred from the use of a dangerous weapon. *People v DeLisle*, 202 Mich App 658, 672; 509 NW2d 885 (1993).

First-degree premeditated murder requires premeditation and deliberation. *People v Wofford*, 196 Mich App 275, 277; 492 NW2d 747 (1992). Premeditation and deliberation require "a lapse of time between the initial homicidal intent and ultimate action which would be long enough to afford a reasonable man time to subject the nature of his response to a second look." *People v Conklin*, 118 Mich App 90, 93; 324 NW2d 537 (1982), rejected in part on other grounds by *Williams*, 422 Mich 381 (internal quotation marks and citation omitted). The time lapse could be anywhere from a few seconds to hours, "depending on the totality of the circumstances surrounding the killing." *Id*. Evidence of premeditation and deliberation need not be direct, but may be inferred from the facts and circumstances surrounding the killing, including: "a weapon acquired and positioned in preparation for the homicide, circumstances and events surrounding the killing, and organized conduct prior or subsequent to the killing suggesting the existence of a plan." *People v Youngblood*, 165 Mich App 381, 387; 418 NW2d

472 (1988). Under the doctrine of transferred intent, if the evidence shows that defendant intended to kill one person but accidently killed another, defendant's intent to kill transfers from the intended victim to the actual victim and defendant may be guilty of first-degree murder of the actual victim. *Id*. at 388.

Defendant's interview alone established that he acted with the specific intent to kill, after sufficient premeditation and deliberation. He indicated that they went to Essling because Bailey had been murdered earlier that day, someone named Nuna had killed defendant's friend Diggs two years earlier, and they were "fed up with that shit." In addition, defendant's actions both before and after the shooting, as well as the use of a .40 caliber firearm, supports a finding of intent to kill. See *DeLisle*, 202 Mich App at 672. Defendant might not have intended to kill Layla Jones, but he intended to kill someone, and that intent transfers to the shooting of Jones under a theory of transferred intent.

We remand the case to the trial court to correct the sentence imposed for conspiracy to commit first-degree premeditated murder. In all other respects, we affirm. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Mark J. Cavanagh
/s/ Michael J. Kelly