# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

JOSHUA SCOTT MORRISON,

       Defendant-Appellant.

UNPUBLISHED
June 23, 2016

No. 325896
Wayne Circuit Court
LC No. 14-005870-FC

Before: TALBOT, C.J., and MURRAY and SERVITTO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(f); two counts of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(b); and one count of aggravated domestic violence, MCL 750.81a. The jury acquitted defendant of an additional count of CSC-III. The trial court sentenced defendant to prison terms of 18 to 50 years for the CSC-I conviction, 10 to 15 years for each CSC-III conviction, and a term of 12 months for the domestic violence conviction, to be served concurrently. We affirm.

## I. BACKGROUND FACTS

Defendant was convicted of sexually assaulting a 33-year-old developmentally delayed woman who had known defendant for many years because they attended the same alternative school. The victim's legal guardian attempted to keep the victim away from defendant, who the guardian believed was more advanced than the victim. On the morning after the guardian made the victim end a telephone call with defendant, the guardian discovered that the victim was not at home. The guardian found a note purportedly written by the victim announcing that she had had enough and had left. In the note, the victim referred to the guardian as a "bitch," but the guardian did not believe that the victim had actually written the note because of her limited language skills.

The guardian eventually found the victim at defendant's apartment and contacted the police. The police would not make the victim leave defendant's apartment because the guardian did not have her guardianship documents with her, and there was no indication that the victim's needs were not being met at that time. Four days later, the victim arrived at the police department and reported that she had been raped. The victim had noticeable bite marks and bruises on different areas of her body.

-1-

At the urging of a police officer, the guardian took the victim to a sexual assault nurse examiner (SANE), Sarah Rapp, who with the assistance of the guardian, took the victim's medical history. Rapp then met with the victim alone. Rapp observed that the victim was cognitively delayed and it was difficult to get information from her, but Rapp made a written report of the victim's statements, which the trial court admitted at trial. The written report states:

> "Patient states 'I was staying with Josh for four days. On Monday I was getting ready for bed and he bit my breast, groin and arm. I was trying to push him away. I said ouch. I walked away. On Tuesday night he grabbed me and threw me on the bed. He pulled my hair and forced my mouth to his penis. Then he made me get on top of him. He put his penis up to my vagina. He forced his penis and fingers in my vagina. He also stuck his fingers and penis in my butt. I got off him and walked away. I went to the bathroom to brush my teeth. He came in and pulled my pants down and he grabbed the razor. He started to shave my pubic area. I was really scared. Later than [sic] night he hit me in the back."

According to Rapp, the victim was calm and cooperative throughout the examination. She identified defendant as the person responsible for her injuries, and reported that defendant had fondled her buttocks, tried to lick her "private area," bit her breast, groin, and arm, restrained her by grabbing her shoulder, and tried to strangle her. Rapp had to define or demonstrate the terms "fondling" and "strangulation." The victim also told Rapp that defendant had penetrated both her vagina and butt, with both his penis and fingers. The victim also reported that defendant put his mouth on her vagina and she put her mouth on his penis. The victim denied that defendant received any injuries.

Rapp documented the victim's physical injuries and gave her medications to prevent disease and pregnancy. Rapp also collected samples for DNA testing. DNA collected from the area where the victim had been bit matched defendant's DNA profile. The victim denied that the sex with defendant was consensual.

At trial, the victim testified that a neighbor helped her get to defendant's apartment. The victim denied leaving a note for her guardian. The victim testified that she received her bruises and bite marks while at defendant's apartment. The victim initially did not want to talk about what happened, but pointed to her genital area and said that her "private part" was sore, there was some bleeding, and it burned. She also described her buttocks as sore and bleeding. She eventually testified that defendant "fingered" her in her "private part" and buttocks, which she told him not to do. She also described defendant placing his penis in her mouth, which she also did not want him to do.

The victim was asked if she knew what the word "raped" meant and she responded, "No. Sort of, but no." Although she could not explain what the word meant, she testified that she was raped by defendant "[o]n my vagina" and pointed to her genital area. The following exchange occurred during which the victim was asked to describe what happened to her "private part":

> *Q.* Can you tell us what happened to your private part when you got raped?

*MR. REMSKI* [Defense Counsel]:  Objection, Your Honor.

*THE COURT*:  Overruled.  I'm going to allow that question.

*BY MS. WINEGARDEN [sic]*:  (*continuing*)

Q.  Okay.

A.  His penis.

Q.  What did his penis do?

A.  Down here.

Q.  Say that again.

A.  Down here by my private part.

Q.  Okay.  I didn't hear you.  Say that --

A.  My private part.

Q.  Okay.  What did his penis do to your private part?

A.  Tried to go in there and it --

Q.  Okay.  It tried to go in there?

A.  Yes.

Q.  How did that feel?

A.  It hurts when he put it in there.

Q.  Did you say anything about it hurting?

A.  No.

Q.  Did it go inside your private part?

A.  Yes.

Q.  All right.  Did you tell him that you wanted him to do that to you?

A.  No.

Q.  What did you say?

A.  I said no.

The victim testified that defendant tore two pairs of her underwear. On the fourth night at defendant's apartment, while defendant was gone, the victim left the apartment and went to a nearby police station.

The defense called several witnesses who testified that they observed defendant and the victim together during the four days she stayed with him. According to the witnesses, defendant and the victim acted as a couple. The victim did not complain of being mistreated and no one observed any injuries on the victim, even when she was swimming in the apartment complex's pool or playing soccer outside. The apartment manager testified that he received an application to add the victim as a tenant on defendant's lease, but the manager did not know who completed the application.

Defendant testified that he received benefits for a disability, but he was able to work and live on his own. He denied convincing the victim to run away from home, and claimed that she showed up at his apartment on her own. He admitted having sex with the victim one time, and claimed that the victim was the aggressor. When defendant accused the victim of taking advantage of him, she told him that she would go to the police and report that he had forced himself on her. Defendant admitted that he bit the victim on her arm when he tried to get her off of him. He also admitted causing some of the smaller bruises, but claimed that the victim caused the larger bruises on her chest by hitting herself.

## II. STATEMENTS MADE TO SEXUAL ASSAULT NURSE EXAMINER

Defendant first argues that the trial court erred in admitting the victim's statements to Nurse Rapp during the medical examination. Defendant argues that the victim's statements were inadmissible hearsay and that admission of the statements also violated his constitutional right of confrontation because the statements were testimonial in nature. Defendant preserved the hearsay issue by objecting on that basis at trial. However, defendant did not object on the ground that admission of this testimony violated his constitutional right of confrontation, leaving that issue unpreserved. *People v Asevedo*, 217 Mich App 393, 398; 551 NW2d 478 (1996) ("[a]n objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground"). We review a preserved evidentiary decision for an abuse of discretion, but any preliminary questions of law are reviewed de novo. *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003). We review defendant's unpreserved constitutional argument for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 761-767; 597 NW2d 130 (1999).

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). "Hearsay is not admissible except as provided by the[] rules [of evidence]." MRE 802. The trial court ruled that the victim's out-of-court statements to Nurse Rapp were admissible under MRE 803(4), which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

* * *

(4) **Statements Made for Purposes of Medical Treatment or Medical Diagnosis in Connection With Treatment.** Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

In *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011), this Court concluded that statements made to a nurse performing a rape examination were admissible under MRE 803(4), explaining:

> Statements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care. This is true irrespective of whether the declarant sustained any immediately apparent physical injury. *People v Garland*, 286 Mich App 1, 8-10; 777 NW2d 732 (2009). Particularly in cases of sexual assault, in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment. *Id.* at 9-10; *People v McElhaney*, 215 Mich App 269, 282-283; 545 NW2d 18 (1996). Thus, statements the victim made to the nurse were all properly admissible pursuant to MRE 803(4).

We reject defendant's argument that the victim's statements to Nurse Rapp were not admissible under MRE 803(4) because there was no indication of a medical emergency in which the victim would be motivated to tell the truth, and no indication that her statements were reasonably necessary for treatment. The victim had several noticeable injuries, including bruises or bite marks on her arm, shoulder, chest, groin, and breast. Although the victim had difficulty communicating with Nurse Rapp due to her intellectual limitations, those communication difficulties do not lessen her motivation to be truthful in order to receive proper medical care. Further, the victim's statements describing how she sustained her injuries are properly considered to be statements reasonably necessary for her medical treatment. To the extent that defendant questions Nurse Rapp's status as a medical provider as a basis for challenging the admission of the victim's statements under MRE 803(4), his argument lacks merit because this Court has treated sexual assault nurse examiners as medical personnel for purposes of MRE 803(4). Like in *Mahone*, 294 Mich App at 214-215, the victim was seen by Nurse Rapp primarily to address her medical condition and to evaluate the necessity of immediate treatment or referral for further treatment. The trial court did not abuse its discretion in admitting the statements under MRE 803(4).

We also reject defendant's unpreserved argument that admission of the victim's statements to Nurse Rapp violated his rights under the Confrontation Clause, US Const, Am VI, Const 1963, art 1, § 20. Hearsay evidence that is nontestimonial does not violate the Confrontation Clause. *Garland*, 286 Mich App at 10. Statements are testimonial if the "primary purpose" of the statements or the questioning that elicits them "is to establish or prove past

-5-

events potentially relevant to later criminal prosecution." *Id.*, quoting *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006). Although a police officer advised the victim's guardian to take the victim for a forensic examination, the victim had visibly apparent injuries, thereby establishing the necessity of a medical evaluation to meet an ongoing emergency. Nurse Rapp was not present during the police interview, the police were not present during the medical examination, and Nurse Rapp stated that the police did not tell her what kind of physical examination to perform. The circumstances indicate that the victim's statements to Nurse Rapp were for the primary purposes of diagnosing her medical condition and determining appropriate treatment options, not for the purpose of prosecuting a case against defendant. Accordingly, the victim's statements to Nurse Rapp were not testimonial. See *Garland*, 286 Mich App at 10-12. In addition, the victim was available for cross-examination. Thus, defendant had the opportunity to confront the victim at trial. Therefore, the admission of the victim's statements to Nurse Rapp was not plain error under the Confrontation Clause.

## III. EXCLUSION OF EVIDENCE

Defendant next argues that the trial court erred in excluding, as inadmissible hearsay, certain testimony from two defense witnesses. He further argues that the trial court's exclusion of this evidence deprived him of his constitutional right to present a defense. We review the trial court's exclusion of evidence for an abuse of discretion, but any preliminary questions of law are reviewed de novo. *Washington*, 468 Mich at 670-671. Whether defendant was denied his constitutional right to present a defense is also reviewed de novo. *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002).

At trial, defendant called David Hornbeck, who testified that he visited defendant's apartment after the victim moved in. The trial court precluded Hornbeck from testifying what he learned about the details of defendant and the victim's living arrangement. Defendant argues that this proposed testimony was not hearsay because it was not offered for its truth. MRE 801(c). We disagree. Any statement related to Hornbeck by either the victim or defendant regarding their living arrangements would necessarily have been relevant only if offered for its truth. Therefore, any response would have been hearsay. Although defendant also argues that the testimony was admissible for impeachment, a nonhearsay purpose, see *Howard v Kowalski*, 296 Mich App 664, 676-677; 823 NW2d 302 (2012), rev'd in part on other grounds 495 Mich 982 (2014), defendant did not indicate whether he was seeking to elicit information from the victim or defendant concerning the living situation, and he did not identify any testimony that he was seeking to impeach. Accordingly, the trial court did not abuse its discretion in excluding this testimony.

Defendant also argues that the trial court erred when it limited the following testimony from Hornbeck:

> *Q*. And did their relationship appear normal or abnormal in any fashion? What was going on at that time?
>
> *A*. When I arrived I was there, you know, kind of just talking to Josh, so my conversation with her was brief. They were both in the apartment when I

arrived. And so Josh just wanted to talk, so we went outside the apartment. But I asked how she was.

> *MS. WEINGARDEN* [the Prosecutor]: Objection to the hearsay.

> *MR. REMSKI* [Defense Counsel]: Well, I can give you an offer of proof as it pertains to her conversations. But I will agree that the conversations he had with Josh may be hearsay.

> *MS. WEINGARDEN*: I think they're both hearsay.

> *THE COURT*: They're both hearsay.

> *MR. REMSKI*: Not if his conversation with [the victim] is offered to impeach.

> *MS. WEINGARDEN*: [The victim] was never asked if this man came to visit and whether she spoke with him.

> *THE COURT*: I agree. Move on.

*BY MR. REMSKI*:

*Q*. Did you have any discussion - -

> *MR. REMSKI*: Your Honor, without telling you what I think the proposed evidence is - -

> *THE COURT*: Just approach, please.

> (*Off the record*)

> (*Back on the record*)

> *THE COURT*: Okay.

*BY MR. REMSKI*:

*Q*. So on this particular occasion you spoke with [the victim], correct?

*A*. Yes.

*Q*. Was there anything unusual about what was going on in the apartment from her perspective?

*A*. Not that I recall.

The trial court prevented defendant from eliciting Hornbeck's response to his question about how the victim was doing. Although defendant argued that he was trying to impeach the

-7-

victim's credibility, the victim was never asked about Hornbeck's visit. Thus, there was no testimony to impeach. Because defendant did not identify any prior testimony that Hornbeck's testimony was intended to impeach, the trial court did not abuse its discretion by excluding the testimony.

Defendant also argues that the trial court erred in excluding Gary Sundin's testimony that the victim told him that she and defendant were getting married on Labor Day. We agree that the trial court erred in ruling that this testimony was inadmissible hearsay. The statement was not being offered for its truth (i.e., to prove that the victim and defendant intended to marry on Labor Day), but rather to show the victim's voluntary association with defendant. In addition, the testimony was admissible for impeachment because the victim was asked at trial about making such a comment and she denied telling people that they were going to be married. However, the erroneous exclusion of this testimony was harmless. "A preserved error in the admission of evidence does not warrant reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013).

It was not in dispute that the victim may have initially agreed to stay with defendant, or even move in with him. The principal issue in the case was whether their sexual relationship was voluntary. Defendant presented substantial other evidence showing that he and the victim voluntarily interacted, both before and after the victim moved to his apartment, and that the victim was observed acting romantically toward defendant while at his apartment, and the two appeared to be a couple. Considering this other evidence, it is not more probable than not that the exclusion of the victim's statement about marrying defendant on Labor Day was outcome determinative. Therefore, the error was harmless.

Defendant also cannot show that the trial court's evidentiary rulings deprived him of his constitutional right to present a defense. The fundamental right to present a defense does not excuse a defendant's obligation to satisfy procedural and evidentiary rules. *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984). A defendant's constitutional rights are still limited by the requirements that evidence be relevant and admissible. *People v Hackett*, 421 Mich 338, 354; 365 NW2d 120 (1984). The trial court excluded certain out-of-court statements, but did not otherwise prevent defendant from presenting evidence that he and the victim voluntarily interacted before the victim moved to defendant's apartment, that the victim thereafter went to defendant's apartment voluntarily, that the victim openly acted affectionately toward defendant, such as by frequently kissing or embracing, and that defendant and the victim otherwise acted like a couple. The trial court's evidentiary rulings did not prevent defendant from presenting a defense.

## IV. GREAT WEIGHT OF THE EVIDENCE

Defendant argues that the jury's verdict is against the great weight of the evidence, and that the trial court erred in denying his motion for a new trial on this ground. We disagree. We review "for an abuse of discretion a trial court's grant or denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of reasonable and principled outcomes. *Id.*

Whether the trial court applied the correct legal standard is a question of law, which is reviewed de novo. *People v Sierb*, 456 Mich 519, 522; 581 NW2d 219 (1998).

In his motion for a new trial, defendant argued that the jury's verdict was dependent on the victim's trial testimony, which was inherently non-credible because it was marked by discrepancies and uncertainties, and because it was influenced by the prosecutor's many leading questions, several of which resulted in objections that were sustained. Defendant argued that the jury's verdict was against the great weight of the evidence considering the many credibility problems associated with the victim's testimony. Defendant now argues that, in denying his motion for a new trial, the trial court erroneously focused on the victim's credibility, and failed to consider other portions of his argument, such as the prosecutor's use of leading questions and the victim's inability to understand certain terms such as "rape" and "penis."

In *Lacalamita*, 286 Mich App at 469, this Court described the general standards for considering a motion for a new trial based on the great weight of the evidence:

> The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v McCray*, 245 Mich App 631, 637; 630 NW2d 633 (2001). Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence. *People v Plummer*, 229 Mich App 293, 306; 581 NW2d 753 (1998). "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998). Further, the resolution of credibility questions is within the exclusive province of the jury. *People v DeLisle*, 202 Mich App 658, 662; 509 NW2d 885 (1993).

Although defendant argues that the trial court erroneously focused on witness credibility and its refusal to act as a "thirteenth juror," defendant acknowledged in his motion for a new trial that all of his arguments related to the general issue of the victim's credibility. Defendant's argument that the victim did not understand the terms "rape" and "penis" was offered as support for his position that the jury could not rely on her testimony. In addition, defendant argued that the prosecutor's use of leading questions was necessary to address the credibility problems associated with her testimony. We believe that the trial court acted within its discretion by refusing to second-guess the jury's determination of the victim's credibility.

In *Lemmon*, 456 Mich at 642, our Supreme Court explained that, absent extraordinary circumstances, issues of witness credibility are for the jury and the trial court may not substitute its view of the credibility of the evidence for the jury's determination thereof. The Court identified the following narrow exceptions to this rule:

> We reiterate the observation in *Anderson v Conterio*, 303 Mich 75, 79; 5 NW2d 572 (1942), that, when testimony is in direct conflict and testimony supporting the verdict has been impeached, if "it cannot be said as a matter of law

that the testimony thus impeached was deprived of all probative value or that the jury could not believe it," the credibility of witnesses is for the jury.

Adding flesh to what is a more refined articulation of the formula that " '[i]n general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial,' " *United States v Garcia*, 978 F2d 746, 748 (CA 1, 1992), quoting with approval *United States v Kuzniar*, 881 F2d 466, 470 (CA 7, 1989), federal circuit courts have carved out a very narrow exception to the rule that the trial court may not take the testimony away from the jury. *Id*. at 470-471. Defining the exception, the federal courts have developed several tests that would allow application of the exception; for example, if the "testimony contradicts indisputable physical facts or laws," *id*., "[w]here testimony is patently incredible or defies physical realities," *United States v Sanchez*, 969 F2d 1409, 1414 (CA 2, 1992), "[w]here a witness's testimony is material and is so inherently implausible that it could not be believed by a reasonable juror," *Garcia, supra* at 748, or where the witnesses testimony has been seriously "impeached" and the case marked by "uncertainties and discrepancies." *United States v Martinez*, 763 F2d 1297, 1313 (CA 11, 1985).

This does not mean that "[a] judge's disagreement with the jury's verdict," *United States v Arrington*, 757 F2d 1484, 1486 (CA 4, 1985), or a "trial judge's rejection of all or part of the testimony of a witness or witnesses," entitles a defendant to a new trial. *Sanchez, supra* at 1414. Rather, a trial judge must determine if one of the tests applies so that it would seriously undermine the credibility of a witness' testimony and, if so, is there "a real concern that an innocent person may have been convicted" or that "it would be a manifest injustice" to allow the guilty verdict to stand. *Id*. If the "evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions," the judge may not disturb the jury findings although his judgment might incline him the other way. *Kringstad, supra* at 307. Any "real concern" that an innocent person has been convicted would arise "only if the credible trial evidence weighs more heavily in [the defendant's] favor than against it." *Polin, supra* at 551. [*Lemmon*, 456 Mich at 642-645 (footnotes omitted).]

Defendant has not shown that the trial court abused its discretion in denying his motion for a new trial. It was undisputed that the victim's cognitive limitations made it difficult for her to understand many of the terms used in the proceeding, or to articulate definitions for certain terms that she used (e.g., "rape" and "penis"). The victim's mental limitations placed her in the range of a four- to ten-year-old child, and her reading skills were comparable to a four- to five-year-old child. The victim's cognitive limitations also affected her ability to verbalize different events that occurred. As a result, the prosecutor was often required to reword her questions, leading to many objections, several of which were sustained because the questions were leading. But the victim's cognitive difficulties did not deprive her testimony of all probative value. The jury could reasonably determine that, viewing her testimony as a whole, she was able to convey that she did not voluntarily agree to have sex with defendant. In addition, independent evidence of the victim's many injuries supported her testimony that the sexual activity was nonconsensual. The jury reasonably could find that the victim's difficulty in defining the acts that she otherwise

-10-

was able to describe was due to her cognitive limitations, and did not affect the overall veracity of her testimony.

Although defendant maintains that the victim's testimony was marked by uncertainties and discrepancies, she was able to describe involuntary sexual acts committed by defendant, in addition to physically assaultive conduct by him. She also gave consistent accounts of what occurred to her to both the investigating police officer and the sexual assault nurse. Her testimony was corroborated by photographs of the multiple bruises and other injuries that she described receiving in her testimony, and DNA evidence corroborated her testimony that defendant bit her on her shoulder. Although defendant claimed that this occurred as part of consensual sex, it was up to the jury to resolve any conflicts between the victim's testimony and defendant's testimony. Considering the photographic and DNA evidence, the victim's testimony was not rifled with uncertainties and discrepancies.

Contrary to what defendant argues, the trial court did not focus only on the legal sufficiency of the evidence, and fail to consider the weight of the evidence. The trial court reviewed the evidence in the case and appropriately concluded that the victim's testimony was not so incredible that it could not be believed. The trial court applied the correct legal standards when reviewing defendant's motion, and it did not abuse its discretion in denying the motion for a new trial.

## V. SCORING OF THE SENTENCING GUIDELINES[1]

Defendant argues that resentencing is required because the trial court erred in scoring offense variables (OV) 4, 7, and 10 of the sentencing guidelines. We disagree. As this Court recently explained in *People v Schrauben*, ___ Mich App ___; ___ NW2d ___ (2016) (Docket No. 323170), slip op at 7:

> We review for clear error the trial court's factual determinations, which must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). We review de novo whether the factual determinations were sufficient to score OV 4. *Id*. See also *People v Steanhouse*, ___ Mich App ___; ___ NW2d ___ (2015); slip op at 19 (holding that because scoring the offense variables remains relevant under *Lockridge*, the standards of review traditionally applied to the trial court's scoring of the offense variables remain viable).

### A. OV 4

Defendant challenges the trial court's assessment of 10 points for OV 4. The trial court must assess 10 points for OV 4 if "[s]erious psychological injury requiring professional

---

[1] Defendant also raised a claim of improper judicial fact-finding at sentencing, but he has since withdrawn that claim and elected not to pursue any potential relief available under *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

treatment occurred to a victim." MCL 777.34(1)(a). That the victim did not seek professional treatment is not conclusive when scoring this variable, MCL 777.34(2), but there must be some evidence on the record that the victim actually suffered a psychological injury to justify the assessment of points. *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012). In *Schrauben*, ___ Mich App ___ at ___; slip op at 7, this Court addressed whether a victim's psychological injury qualifies as "serious" for purposes of scoring OV 4, stating:

> Defendant does not challenge the fact that Lehman, the victim, did not seek professional treatment, but rather argues that Lehman's psychological injury was not serious.
>
> In this case, although the statement was not provided to this Court, defendant acknowledges that Lehman indicated in a letter to the trial court that "the past three years have been a struggle for him psychologically." We have upheld a trial court's assessment of 10 points for OV 4 where the victim suffered "personality changes, anger, fright, or feelings of being hurt, unsafe, or violated." *People v Armstrong*, 305 Mich App 230, 247; 851 NW2d 856 (2014).
>
> Further, the trial court noted that based on its memory and the impression it got from trial, it "would be ignoring the obvious if [it] were to say that there were no signs or no evidence of serious psychological injury requiring professional treatment." The trial court had the opportunity to observe Lehman's demeanor during trial and noted how the funeral home was his life and when defendant committed the crimes, everything changed for Lehman. See *Steanhouse*, ___ Mich App at ___; slip op at 20 (discussing serious psychological injury as it relates to OV 5 and noting that the trial court's opportunity to observe the demeanor of the victim's family members supported its factual findings that they sustained psychological injury). Accordingly, we conclude that the trial court's factual finding that Lehman suffered a serious psychological injury was not clearly erroneous and was supported by a preponderance of the evidence. The evidence sufficiently demonstrates that Lehman suffered a serious psychological injury that may require professional treatment, and therefore, the trial court properly assessed 10 points for OV 4.

At sentencing, the victim's guardian discussed how the victim had been affected by defendant's conduct, and explained that "[h]e has now left her not trusting people like she did." The trial court was also advised that the victim had received psychological counseling. The evidence that the victim no longer trusted people like she did before the offense, for which she had received psychological counseling, supports the occurrence of an actual psychological injury that qualifies as serious. Accordingly, the trial court did not err in assessing 10 points for OV 4.

B. OV 7

Defendant challenges the trial court's assessment of 50 points for OV 7. MCL 777.37(1)(a) authorizes a 50-point score for OV 7 if "[a] victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim

suffered during the offense." The trial court determined that a 50-point score was justified because of excessive brutality.

In determining whether a 50-point score for OV 7 is justified, "[t]he relevant inquiries are (1) whether the defendant engaged in conduct beyond the minimum required to commit the offense; and, if so, (2) whether the conduct was intended to make a victim's fear or anxiety greater by a considerable amount." *Hardy*, 494 Mich at 443-444. The prosecutor offered the following reasons in support of a 50-point score for OV 7:

> Judge, my argument is that someone can rape someone and not leave bite marks all over their body. The defendant bit her on three different parts of her body. And you saw pictures of bruising on her breast. You heard that there was DNA on her shoulder, and the defendant out of his own mouth admitted to biting her thigh. That was excessively brutal. As the guardian said just a few moments ago, better than I could ever say it, an animal does that. A human doesn't do that to another human. It was excessive brutality. And the only reason for him to do that was to increase the fear and anxiety the victim felt.

The trial court agreed, commenting, "Certainly given the testimony that I heard and the pictures that I saw, I completely agree that this should be scored at fifty points. This is excessive brutality in my view."

The evidence showed that the victim sustained multiple bruises and bite marks on many areas of her body, some of which left her with permanent injuries. The victim's guardian explained that the victim "still has nodules on her breast, where you can feel where the teeth actually bit her." The number and nature of the victim's injuries demonstrate conduct that went beyond the minimum required to commit the offense. The testimony describing the victim's multiple bruises and bite marks also supports that defendant's conduct was intended to substantially increase the victim's fear or anxiety during the offense. Defendant has not shown that the trial court clearly erred in assessing 50 points for OV 7.

## C. OV 10

Defendant also challenges the trial court's assessment of 15 points for OV 10. MCL 777.40(1)(a) provides that 15 points are to be scored for OV 10 if the defendant exploits a vulnerable victim and "[p]redatory conduct was involved." "Predatory conduct" is defined as "preoffense conduct directed at a victim . . . for the primary purpose of victimization." MCL 777.40(3)(a). Predatory conduct must have occurred before the commission of the offense. *People v Cannon*, 481 Mich 152, 160; 749 NW2d 257 (2008). In *Cannon*, 481 Mich at 162, the Court stated that the following three questions must be answered in the affirmative before OV 10 may be scored at 15 points:

> (1) Did the offender engage in conduct before the commission of the offense?

> (2) Was this conduct directed at one or more specific victims who suffered from a readily apparent susceptibility to injury, physical restraint, persuasion, or temptation?

(3) Was victimization the offender's primary purpose for engaging in the preoffense conduct?

The evidence showed that defendant engaged in preoffense conduct by repeatedly contacting the victim, whose cognitive limitations made her readily susceptible to persuasion, and that defendant exploited that vulnerability by convincing her that she would have a better life with him. Once defendant was able to get the victim to his apartment, he was able to commit the offenses without interference from her guardian. The evidence supports the inference that defendant's preoffense conduct was primarily intended to lower the victim's inhibitions and isolate her from her guardian, thereby enabling defendant to sexually exploit her. The trial court did not clearly err in scoring 15 points for OV 10.

Affirmed.

/s/ Michael J. Talbot
/s/ Christopher M. Murray
/s/ Deborah A. Servitto