# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
October 18, 2018

v

No. 339488
Oakland Circuit Court
LC No. 2016-260782-FC

BRANDON K. GOHAGEN,

Defendant-Appellant.

Before: Shapiro, P.J., and Servitto and Gadola, JJ.

Per Curiam.

More than two decades after the murder of Rosalia Brantley, defendant was brought to trial under charges of first-degree felony murder, MCL 750.316(1)(b), and first-degree criminal sexual conduct ("CSC-I"), MCL 750.520b(1)(f). The trial court sentenced defendant to life in prison for the murder conviction and to 20 to 60 years in prison for the CSC-I conviction. Defendant appeals as of right. We affirm.

## I. FACTS

Defendant's convictions arise from the discovery of Rosalia Brantley's body in a public park in Pontiac, Michigan, on August 29, 1994. Two days earlier, on Saturday, August 27, Brantley planned an evening out with her friends Roqueena "Chelle" Sellers and Bridget Sellers. That day, the three women got ready together at the home of Ramona Sellers. Ramona was Roqueena and Bridget's older sister, as well as Brantley's best friend. That night, Brantley, Roqueena, and Bridget planned to attend a party at the home of their friend, Kenneth Wright, before going to a club in Pontiac. Meanwhile, Ramona was to remain at home to care for her own child and babysit Brantley's one-year-old son. Brantley, Roqueena, and Bridget planned to return to Ramona's home at the end of the night.[1]

---

[1] Brantley lived with her mother in Auburn Hills until July 1994, when she moved in with Irvine Penciel, who lived next door to Brantley's mother. Penciel testified that they had separate bedrooms and that their relationship was not romantic. He also testified that the last time he saw Brantley, on August 27, 1994, he loaned her $50.

Brantley, Roqueena, and Bridget left for the party at Wright's home sometime between 6:00 and 9:00 p.m.[2] Roqueena testified that she was not drinking that night because she was pregnant, but testified that Brantley and Bridget were drinking. At the party, Roqueena saw Brantley exit the house and enter a parked car with Derrick Mullin, who she had recently started dating. Roqueena then saw Mullin drive away alone, while Brantley reentered the party. Later that evening, Brantley, Roqueena, and Bridget drove to the club with Dawn "Michelle" Hanna. Roqueena recalled that they arrived at the club after dark, at roughly 8:00 to 8:20 p.m.

The women initially spoke with friends outside the club and then entered the club to dance. Roqueena testified that although men were admiring Brantley, Brantley did not dance with anyone in particular. Roqueena elaborated that Tommy Lee Williams ("Williams"), who had been at Wright's party, attempted to talk to Brantley the entire night but that Brantley did not appear to be interested. According to Roqueena, she remained with Brantley at all times, and Brantley did not "go off" with Williams or any other man. At some point during the night, Roqueena and Hanna briefly went outside the club in search of Hanna's misplaced car keys while Brantley and Bridget remained inside. When Roqueena and Hanna began to return to the club, a shooting occurred inside. Fearful for their safety, Roqueena and Hanna got into a friend's truck and left the club. Although Roqueena wanted to return to the club to search for Brantley and Bridget, she ultimately returned to Ramona's home at approximately 2:00 a.m. on Sunday, August 28, 1994. Shortly afterward, Bridget also arrived at Ramona's home – but without Brantley.

Ramona began to call Brantley's pager repeatedly. Brantley returned Ramona's call at approximately 2:15 a.m. and explained that she was using a payphone near Terry's Tires in Pontiac. Ramona recalled that Brantley was mumbling and sounded fearful but did not sound like she had been drinking.[3] Ramona asked her what she planned to do, and Brantley responded, "Whatever they want me to do." Ramona told Brantley to stay where she was and that she would have someone pick her up. Roqueena and Bridget then left with another friend to look for Brantley near Terry's Tires, and although they searched throughout the neighborhood, they could not find Brantley. After Roqueena and Bridget returned to Ramona's home without Brantley, Ramona paged Brantley seven to nine times but received no response. Neither Ramona nor Roqueena called the police.

Meanwhile, Williams testified that just before the shooting occurred inside the club, he was speaking with Brantley. He recalled that when the shooting began, Brantley ran behind him as everyone fled the club. Williams testified that he accepted a ride from a friend and that

---

[2] Although both Ramona and Roqueena testified that Brantley was carrying a bag containing her nursing uniform with her that night, their testimony diverges with respect to when Brantley acquired the bag. While Ramona testified that Brantley was carrying the bag when she left Ramona's house, Roqueena testified that Brantley's boyfriend, Derrick Mullin, brought her the bag when the group was at the club. Ramona further testified that it was common for Brantley to carry both a bag and a purse with her.

[3] According to the medical examiner, Brantley's BAC at the time of her death was 0.09%.

Brantley asked if she could join them. Brantley and Williams were dropped off at Williams' home, where, according to Williams, he and Brantley "had a couple of drinks" and engaged in unprotected sex. Williams recalled that, at approximately 3:30 or 4:00 a.m. on August 28, Brantley's pager went off several times. According to Williams, Brantley told him, "I got this guy's money in my pocket and I'm supposed to be [in a room] with him." Because Williams did not have a telephone at his home, Brantley walked to a payphone down the street, near Terry's Tires.[4] Williams told her that he would leave the door ajar for her while he waited on the couch. However, Williams fell asleep and, when he woke up the next morning, he realized that the door remained open and that Brantley had never returned.

A body identified as Brantley was discovered in a swampy area of Hawthorne Park in Pontiac the morning of Monday, August 29, 1994. The body was nude and wrapped in a rust-colored curtain. The ankles, knees, hands, and upper arms were bound with torn material from a white sheet, and Brantley's dress, a towel, and a receiving blanket were also wrapped inside the curtain. A white nursing uniform surrounded the feet. Although police tested the curtains and bindings for latent fingerprints, none were recovered. Similarly, tire track impressions, a disposable cup, cigarette butts, and a coat discovered near the body yielded no further evidence. Based on the intact vegetation and general lack of evidence at the scene, Diana Peters, an identification technician at the Pontiac Police Department, opined that Brantley had been killed elsewhere and that her body had been subsequently dumped at the park.

Dr. Kanu Virani, the deputy chief medical examiner who examined Brantley's body, classified the manner of Brantley's death as homicide and estimated the time of death to be the evening of August 27 or the early morning hours of August 28, 1994. Dr. Virani's examination revealed that the cause of Brantley's death was a large stab wound to the lower left breast, resulting in a punctured lung. Brantley also suffered a stab wound to her neck that perforated the voice box, which alone could have been fatal. In addition to these fatal injuries, Brantley sustained multiple pre-mortem injuries to her face, including several incised wounds created by a sharp object and bruising to her right eye, both cheeks, lower lip, chin, and neck. According to Dr. Virani, multiple abrasions and contusions to Brantley's torso evinced a struggle, while bruising and contusions on her left hand, forearm, and elbow were similarly classified as defensive wounds. Dr. Virani opined that these nonfatal wounds occurred very shortly before Brantley's death. Finally, a vaginal swab recovered a seminal DNA sample from a single male donor. A blood DNA sample recovered from beneath Brantley's fingernail matched the seminal DNA, indicating the two samples originated from the same male donor.

---

[4] On August 31, 1994, the police interviewed Williams. According to the police report, Williams stated that Brantley used the payphone near Terry's tires twice. The first time, he stated he accompanied Brantley while she made a call at approximately 2:00 or 2:30 a.m. on August 28. The second time, at approximately 4:00 or 4:30 a.m., Williams stated Brantley left his house alone. However, during trial, Williams did not recall making this statement, testifying that Brantley left to use the payphone only once and that he did not accompany her.

The 1994 investigation of Brantley's murder was ultimately inconclusive. Although Williams admitted to the police that he had unprotected intercourse with Brantley, his DNA did not match the DNA samples recovered from the vaginal swab or from Brantley's fingernail. However, in 2013, nearly two decades later, the DNA samples from the vaginal swab and fingernail were retested and generated a match with defendant's DNA. A buccal swab from defendant verified the match. Ramona and Williams both testified during trial that they did not know defendant, while Ramona further testified that she was unaware of any relationship between Brantley and defendant. The parties stipulated that defendant resided in Pontiac at the time of Brantley's murder.

On November 28, 2016, the prosecutor charged defendant with: (1) first-degree premeditated murder, MCL 750.316(1)(a), (2) first-degree felony murder, MCL 750.316(1)(b), and (3) CSC-I, MCL 750.520b(1)(f). On the first day of trial, however, the prosecutor dismissed Count I and elected to proceed to trial on only Counts II and III. The jury found defendant guilty on both counts, and he was sentenced as a second-degree habitual offender to life in prison without parole for the felony murder conviction and to 20 to 60 years in prison for the CSC-I conviction.

## II. ANALYSIS

On appeal, defendant challenges the sufficiency of the evidence in support of his convictions. When considering a challenge to the sufficiency of the evidence supporting a conviction, this Court applies the de novo standard of review. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010). In evaluating the sufficiency of the evidence, the Court reviews the evidence in the light most favorable to the prosecution to "determine whether a rational trier of fact could find that the evidence proved the essential elements of the crime beyond a reasonable doubt." *Id.* at 175. All reasonable inferences should be drawn and all conflicts within the evidence should be resolved in favor of the prosecution. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000); *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005). "The scope of review is the same whether the evidence is direct or circumstantial. 'Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime.' " *Nowack*, 462 Mich at 400, quoting *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). When the prosecution relies on circumstantial evidence, the trier of fact, and not the court, determines what inferences may be fairly drawn therefrom and the weight to be accorded to those inferences. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

The elements necessary to prove felony murder are:

(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in . . . [MCL 750.316(1)(b), including CSC-I]. [*People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999) (quotation marks and citation omitted).]

-4-

Defendant was charged with murdering Brantley while committing the underlying felony of CSC-I. Under MCL 750.520b(1),

> A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:
>
> * * *
>
> (f) The actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration. Force or coercion includes, but is not limited to, any of the following circumstances:
>
> (*i*) When the actor overcomes the victim through the actual application of physical force or physical violence.
>
> (*ii*) When the actor coerces the victim to submit by threatening to use force or violence on the victim, and the victim believes that the actor has the present ability to execute these threats.
>
> (*iii*) When the actor coerces the victim to submit by threatening to retaliate in the future against the victim, or any other person, and the victim believes that the actor has the ability to execute this threat. As used in this subdivision, "to retaliate" includes threats of physical punishment, kidnapping, or extortion.
>
> (*iv*) When the actor engages in the medical treatment or examination of the victim in a manner or for purposes that are medically recognized as unethical or unacceptable.
>
> (*v*) When the actor, through concealment or by the element of surprise, is able to overcome the victim.

"Thus, an actor may be found guilty under MCL 750.520b(1)(f) if the actor (1) causes personal injury to the victim, (2) engages in sexual penetration with the victim, and (3) uses force or coercion to accomplish the sexual penetration." *People v Nickens*, 470 Mich 622, 629; 685 NW2d 657 (2004). "Personal injury" is statutorily defined as "bodily injury, disfigurement, mental anguish, chronic pain, pregnancy, disease, or loss or impairment of a sexual or reproductive organ." MCL 750.520a(n).

On appeal, defendant does not dispute that he engaged in sexual penetration with Brantley or that Brantley sustained personal injuries resulting in her death. Rather, he primarily contends that the prosecution failed to prove beyond a reasonable doubt either (1) Brantley's lack of consent to the sexual intercourse, i.e., that he used force or coercion to accomplish the sexual penetration, or (2) that he caused Brantley's injuries or death. In the purported absence of sufficient evidence proving these requisite elements, defendant maintains that this Court must vacate the convictions of CSC-I and felony murder. We disagree.

The circumstantial evidence presented during trial was sufficient to permit a rational trier of fact to conclude that defendant used force to accomplish sexual penetration of Brantley. According to the testimony of Ramona, Roqueena, and Williams, Brantley disappeared in the early morning hours of August 28, 1994, between 2:15 and 4:00 a.m. Ramona testified that Brantley called her from the payphone near Terry's Tires at 2:15 a.m., and that she sounded fearful. Although Ramona told Brantley to remain where she was and that someone would pick her up, Roqueena's search for Brantley in that area and the surrounding neighborhoods was unsuccessful. Williams, in turn, testified that Brantley left his home to use a nearby payphone at Terry's Tires after receiving several pages between 3:30 and 4:00 a.m. He stated that Brantley never returned. In light of Brantley's disappearance – when the testimony established that she had planned either to return to Williams' home or wait to be picked up – a rational jury could have inferred that she left the area against her will.

The evidence would also permit a rational jury to conclude that defendant was a stranger not only to Brantley's friends but also to Brantley herself. Williams denied knowing defendant. Likewise, Ramona, Brantley's best friend, testified that did not know defendant and that she was unaware of any relationship between defendant and Brantley. Furthermore, Detective Ronald Carpenter testified that during the course of the police investigation in 1994, defendant's name was never mentioned as a family member, friend, or acquaintance of Brantley. Defendant contends that the prosecution cannot claim to know every man with whom Brantley socialized more than 20 years ago. However, we conclude that the prosecution presented competent testimony from Brantley's best friend and the detective responsible for investigating the case in 1994, both of whom indicated a lack of any connection between defendant and Brantley. Such evidence is sufficient to permit the rational inference that Brantley did not know defendant. To the extent that defendant seeks to cast doubt on this testimony, such an issue amounts to a credibility determination reserved for the jury. See *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008), citing *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999).

The prosecution further established through Ramona's testimony that Brantley did not normally engage in casual sex. Defendant contends that the fact that Brantley had sex with Williams while she was also in a dating relationship with Derrick Mullin undercuts Ramona's testimony that it was not in character for Brantley to engage in casual sex. This argument is flawed, however, insofar as the evidence demonstrates that Mullin and Williams were both known friends of Brantley, whereas defendant was a stranger. Moreover, defendant's argument again calls for this Court to make a credibility determination and to evaluate the weight accorded to the evidence, tasks within the exclusive province of the jury. See *id*. Accordingly, the testimonial evidence, coupled with the undisputed fact of defendant's sexual contact with Brantley, would permit a rational jury to infer that Brantley did not consent to have sexual intercourse with defendant, who the jury could also reasonably conclude was a perfect stranger.

Evidence regarding the nature and extent of Brantley's injuries also supports an inference that defendant accomplished sexual penetration through use of force. Dr. Virani's forensic examination revealed that Brantley suffered from multiple incised wounds on her face, as well as extensive blunt force injuries to her face, eye, neck, chest, and torso. Dr. Virani opined that these abrasions and contusions were pre-mortem and could have been caused during a struggle. Additional scraping, bruising, and contusions on Brantley's left hand and forearm were classified

as defensive wounds, while the blood sample found beneath Brantley's fingernail matched defendant's DNA.[5] The physical evidence thus lends additional support to the inference that these injuries were sustained in Brantley's attempts to ward off a forceful sexual assault. In view of this evidence, as well as the evidence discussed below, we conclude that a trier of fact could have reasonably concluded that defendant used force or coercion to accomplish sexual penetration of Brantley.

The evidence presented during trial regarding the timing of events is sufficient to prove beyond a reasonable doubt that defendant was responsible for inflicting the fatal and nonfatal injuries leading to Brantley's death. Dr. Virani opined that Brantley was killed either on the night of August 27 or in the early morning hours of August 28. Testimony demonstrated that in the hours before Brantley's death, she was with her friends at the club and with Williams at his home. Roqueena testified that she remained with Brantley while they were at the club and that Brantley never left with any man. Brantley's last contact with Ramona and Williams occurred between 2:15 and 4:00 a.m. on August 28. Because Brantley's whereabouts were accounted for until this time, the jury could have inferred that defendant could not have had sexual contact with Brantley before she disappeared between these hours. And given Williams' testimony that Brantley was not injured when she left his house at approximately 3:30 or 4:00 a.m., as well as the fact that she died early that same morning, the jury could have reasonably concluded that Brantley was sexually assaulted and killed during the short interval of time in between, soon after leaving Williams' house.

Dr. Virani's testimony and the DNA evidence also support a reasonable inference that defendant's sexual contact with Brantley and the injuries leading to Brantley's death occurred contemporaneously. Dr. Virani testified that, because Brantley's injuries exhibited no signs of healing, they occurred within a very short time prior to her death. Similarly, according to Melinda Jackson, a forensic scientist with the Michigan State Police, the autopsy established that defendant ejaculated inside Brantley shortly before her death. Jackson explained that the sperm cells collected in the DNA sample still possessed attached tails; however, these tails are extremely fragile and tend to break off within a very short time. Although defendant argues that Jackson was unable to define with any specificity how long tails survive on sperm cells, she nonetheless stated the tails "have the tendency to break off quite quickly . . . within a certain period of hours . . . ." Thus, given the evidence that Brantley's sexual contact with defendant both occurred shortly before her injuries and murder, as well as the brief window of time in

_____

[5] Defendant attempts to discredit the DNA evidence acquired from beneath Brantley's fingernail by arguing that the data was unreliable and by suggesting alternative scenarios in which Brantley could have scratched defendant. However, as discussed above, making credibility determinations and assigning weight to the evidence are tasks reserved for the jury that we decline to disturb. See *id*. Further, it is a well-settled principle that the prosecution is not required to present evidence negating every reasonable hypothesis other than that of guilt. *Hardiman*, 466 Mich at 423-424; see also *United States v Holland*, 348 US 121, 139-140; 75 S Ct 127; 99 L Ed 150 (1954).

which these events could have unfolded, the jury was justified in inferring that they occurred contemporaneously and that defendant was the perpetrator.

An intent to kill on the part of defendant may be inferred from the nature of Brantley's fatal wounds. Dr. Virani's testimony established that the fatal, six and a half inch deep stab wound to Brantley's lower left breast was caused by inserting a blade once, removing it partially, and reinserting it at a slightly different angle. Brantley also suffered a potentially fatal stab wound to her neck that punctured her voice box. In view of these injuries, Dr. Virani classified the manner of Brantley's death as homicide. Indeed, the nature of these injuries clearly supports a finding that the wounds were inflicted with the intent to kill or to do great bodily harm. See *People v Ericksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010) (holding that the defendant's intent to kill could be inferred from "the nature, extent, and location" of four knife wounds in the victim's back); *People v DeLisle*, 202 Mich App 658, 672; 509 NW2d 885 (1993) (noting that criminal jury instructions permit an inference of intent to kill from the use of a dangerous weapon).

Viewed as a whole, see *People v Williams*, 94 Mich App 406, 415; 288 NW2d 638 (1979) (observing that the totality of circumstantial evidence must be considered in evaluating the sufficiency of the evidence), the circumstantial evidence demonstrates that, within the brief span of time between 2:15 or 4:00 a.m. on August 28 and the "early morning hours" of August 28, Brantley disappeared, uncharacteristically engaged in sexual contact with defendant, a stranger, and was brutally beaten and stabbed, resulting in her death. The evidence further established that Brantley's sexual contact with defendant and her injuries both occurred shortly before her death. From this evidence, a jury could have reasonably found that the prosecution established the elements of CSC-I beyond a reasonable doubt by demonstrating that defendant engaged in sexual penetration with Brantley, accomplished through his use of physical force that ultimately led to Brantley's personal injuries and death. Moreover, the evidence sufficiently establishes the elements of felony murder, as it demonstrates that, during the course of committing CSC-I, defendant killed Brantley with the requisite intent to kill.

Defendant posits that Brantley could have left the sexual encounter with defendant and been abducted and killed by an unknown perpetrator during the 24-hour period before her body was discovered on August 29. This argument, however, overlooks the fact that Brantley's death was estimated to have occurred, at the latest, in the early morning hours of August 28. Though it may be theoretically possible that, within the brief window of time following her disappearance between 2:15 and 4:00 a.m., Brantley had sex with defendant, a stranger, only later to be abducted and murdered by an unknown perpetrator, "the prosecution need not negate every reasonable theory consistent with the defendant's innocence." *Hardiman*, 466 Mich at 423-424. We reemphasize that weighing the evidence and drawing reasonable inferences from it are within the exclusive domain of the jury and not the Court. *Unger*, 278 Mich App at 232; *Gadomski*, 232 Mich App at 28.

Finally, defendant contends that the evidence implicates both Williams and Penciel, Brantley's housemate, as more likely suspects. With respect to Williams, defendant emphasizes that one of Brantley's last known whereabouts was at his house. But searches of Williams' home returned no evidence of violence, and the DNA samples recovered from Brantley's body did not match Williams' DNA. With respect to Penciel, defendant observes that Brantley

borrowed $50 from Penciel and later indicated to Williams that the pages she received were from a man to whom she owed money. Defendant also cites to police reports recorded in 1994 indicating that witnesses, including Ramona and Roqueena, recognized the curtain and sheet that were wrapped around Brantley's body from Penciel's home. However, Ramona and Roqueena both testified at trial that they did not recognize those items and denied identifying them in 1994 as being from Penciel's home. They further denied knowing Penciel or that Brantley lived with him. When the police searched Penciel's home, no window treatments or bedding was missing, and there was no sign that a violent crime had taken place inside.[6] Additionally, the DNA samples recovered from Brantley's body did not match Penciel's DNA.

Considering the circumstantial evidence presented during the trial in its totality, the evidence was sufficient to permit a rational jury to conclude beyond a reasonable doubt that defendant was guilty of both CSC-I and felony murder.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Deborah A. Servitto
/s/ Michael F. Gadola

---

[6] Defendant also makes the nebulous argument that the jury could infer that Brantley's bag, containing her nursing uniform, came from Penciel's home. Ramona testified that Brantley had the bag when she left Ramona's home for the party, while Roqueena testified that Brantley did not have the bag until Mullin brought it to the club. In any event, Brantley would have possessed the bag by the time she disappeared early on August 28, and there is simply no evidence tying the bag to Penciel.